Carl F. PAGE, Appellant,

v.

William J. BOLGER, Appellee.

No. 78–1792.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 7, 1980.

Decided April 2, 1981.

Kenneth V. Farino, Richmond, Va. (Farino, Oksman, Rick & Kincannon, Richmond, Va., on brief), for appellant.

Marleigh D. Dover, Dept. of Justice, Washington, D. C. (William B. Cummings, U. S. Atty., Eliot Norman, Asst. U. S. Atty., Richmond, Va., Anthony W. DuComb, U. S. Postal Service, Labor Law Division, Washington, D. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, WINTER, BUTZNER, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE and ERVIN, Circuit Judges, sitting en banc.

JAMES DICKSON PHILLIPS, Circuit Judge:

Twice denied promotions he had sought as a federal postal employee, Carl F. Page sued the Postmaster General, claiming racial discrimination in the denials that violated his rights under § 717 of the Civil Rights Act of 1964 (Title VII), *as amended by* § 11 of the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16. Following a plenary trial the district court dismissed his action on the merits and Page appealed to this court. A divided panel of the court reversed, essentially on the basis that the district court erred in failing to find discrimination violative of § 717 in the Postmaster General's use of all-white review committees, contrary to Postal Service internal regulations, in considering applicants for the position to which Page sought promotion. The panel decision remanded with directions to award specified compensatory and injunctive relief. *Page v. Bolger*, No. 78–1792 (4th Cir. Dec. 19, 1979). Upon petition of the Postmaster General, the appeal was then reheard by the court sitting en banc.

Concluding that the district court committed no reversible error in determining that, under the proof scheme adopted for analyzing claims of disparate treatment in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Page had failed to establish his claim of discrimination, we affirm the judgment dismissing his action on the merits.[1]

I

The relevant historical facts, as adduced in evidence before the district court, are not in significant dispute.[2] Page, a black, was a foreman in the mails section of the Richmond Post Office. In January 1976, he was one of several applicants for general foreman of mails, a supervisory position designated as postal executive salary level 17 (PES–17). The Postal Service's *Personnel Handbook* provides that a review committee shall be designated to screen the applicants and to recommend the "most outstanding candidates" to the appointing officer, who in this case was the postmaster.[3] The committee must consist of at least three members who are to be representatives of the district office, the installation with a vacancy, and the sectional center.[4] Section 544.2 of the *Personnel Handbook* provides:

> Review committee members must be at an organizational or grade level equal to or higher than that of the vacant position. The official who designates a review committee is responsible for making every effort to select at least one woman and/or one minority group member. In the absence of available women and/or minority employees at the appropriate

---

1. Page also challenged on this appeal the district court's denial of his motion for leave to amend his complaint to allege a class action. Citing the imminence of trial, scheduled for the next month, and the completion of discovery, the district court declined in its discretion to allow the amendment or to grant an accompanying request for continuance. The panel which first heard this appeal unanimously found no abuse of discretion in this ruling and affirmed it. We agree.

2. The factual summary that follows is adopted, with some change, from that employed in the superseded opinion of the panel that originally heard the appeal. *Page v. Bolger*, No. 78–1792, slip. op. at 2–5 (4th Cir. Dec. 19, 1979).

3. *Id.* § 544.3–1.

4. *Id.* § 544.1–2.

level, committee members must be furnished by the next-higher organizational unit, where available.

The district manager appointed a review committee of three white males to consider the applicants for the PES–17 position. While the committee found that Page was qualified, it also determined that two white males were better qualified. The committee recommended these three applicants to the postmaster, who selected the top-ranked white male.[5] The appointee previously had been administratively detailed to the position pending the outcome of the committee's recommendations. Page protested this appointment and filed a complaint with the Equal Employment Opportunity Commission.

In August 1976, Page sought promotion to postal operations specialist (PES–18). Again the district manager appointed three white males to the review committee. During Page's interview, one of the committee members questioned him about his EEO complaint regarding the PES–17 position. The committee found that Page was qualified for the position, but it named one white male as better qualified. It ranked another white male third. The postmaster selected the top-ranking white male. Again Page protested and filed an EEO complaint. The district manager voided the action of the review committee because of the interrogation about Page's EEO complaint with respect to the PES–17 position. He directed that a new committee be selected and that one of its members be a black employee.

In February 1977, the new committee met to reconsider the PES–18 appointment. A black employee from Philadelphia had been named to the committee, but when the committee met, his assignment to a new job prevented his serving on it. A white male was substituted. This committee, consisting of three white males, found Page to be

qualified for the position, but it concluded that two white males, including the applicant previously ranked third, were better qualified. The top-ranking applicant was the employee who had been recommended in 1976. He had been detailed administratively to the position pending reconsideration by the new review committee. The postmaster accepted the recommendation of the new committee and appointed the incumbent. Page protested and filed another EEO complaint.[6]

After exhausting his administrative remedies with respect to both the PES–17 and –18 appointments, Page filed this action.

## II

The district court conducted a de novo hearing in accordance with *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), receiving essentially the evidence above summarized. It then analyzed this evidence under the proof scheme adopted by the Supreme Court in *McDonnell Douglas* as a "sensible, orderly way to evaluate the evidence," *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), where individual claims of "disparate treatment"—of intentional discrimination in making employment decisions—are put in issue by conflicting evidence as to the employer's motivation in making them.

In the first stage of this analysis, the court found, and the Postmaster General has conceded throughout, that Page's evidence established a prima facie case of discrimination in denying him the promotions he sought. As to these, the evidence showed, in summary, that (i) he belonged to a racial minority; (ii) that he applied and was qualified for the promotions he sought; (iii) that he was denied them; and (iv) the positions thereafter remained open and were in fact filled by the employer from other applicants possessing his general qual-

5. The postmaster testified that it was his practice to appoint the applicant whom the committee had ranked first, although §§ 545.1–.2 of the *Personnel Handbook* do not require him to accept the recommendations.

6. Both EEO complaints were decided against Page. *Page v. Bolger*, No. CA–77–0400–R (E.D.Va. Aug. 16, 1978) (unpublished memorandum order).

ifications. *Cf. McDonnell Douglas*, 411 U.S. at 802 & n.13, 93 S.Ct. at 1824 & n.13 (refusal to hire). This unchallenged conclusion is manifestly not in error.

■ At this point, with the inference of discriminatory motive for denying the promotion raised, the burden is considered shifted to the employer to dispel the inference by coming forward with evidence that a "legitimate, nondiscriminatory reason," *id.* at 802, 93 S.Ct. at 1824, rather than the inferable reason of purposeful discrimination, underlay the decisions to deny promotion.[7] The district court found this burden of production carried and the inference of discrimination sufficiently dispelled by the testimony of review committee members that they did not discriminate against Page because of his race but instead simply considered him relatively less qualified on a subjective and objective basis than the successful applicants. We find no error of law nor clear error of fact underlying this conclusion.

Obviously it must be possible for employers legally to make employment decisions that disfavor qualified minority employees on the basis of a comparative evaluation of their qualifications with those of other applicants. Concededly, when that evaluation is to any degree subjective and when the evaluators are themselves not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision may be subject to particularly close scrutiny by the trial judge. But, as the Supreme Court pointed out in *McDonnell Douglas* itself, the mere fact that subjective criteria are involved in the reason articulated by an employer does not prevent according it sufficient rebuttal weight to dispel the inference of discrimination raised by the prima facie case. *Id.* at 803, 93 S.Ct. at 1824. Here, aside from the testimony—obviously credited by the district judge—of the persons who actually made the promotion decisions that they were not racially motivated, there was objective evidence supporting the comparative evaluation they made.[8] Considering that the proof burden being assessed is at this point merely one of production rather than of persuasion, *see Wright*, 609 F.2d at 714 n.13, we cannot find error in the district court's conclusion that it had been carried.

At this point, though the inference of discrimination has been neutralized, the employee's claim of discrimination may yet be found established if the evidence shows that the employer's stated reason was a mere pretext—"in fact a coverup for a racially discriminatory decision." *McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. at 1825. While

---

7. We have recently discussed the nature and basis of the inference raised by the *McDonnell Douglas* prima facie case and the burden thereby imposed to dispel it in *Wright v. National Archives and Records Service*, 609 F.2d 702 (4th Cir. 1979) (en banc).

8. There is no gainsaying that Page's qualifications, objectively assessed in relation to those of the successful applicants, would have justified his selection in the exercise of a rational business judgment. This is illustrated by the comments of the appeals examiner who conducted the administrative hearing on Page's EEO complaint respecting the PES–18 position. He first compared in tabular form the relative objective qualifications of Page and the successful applicant, and then summarized:

This comparison shows that [Page] has more formal education than the [appointee] and slightly more supervisory experience than [the appointee]. On the other hand, the [appointee] has a higher performance evaluation (although both evaluations are close to outstanding in nature) and greater length of service than [Page]. Both employees appear to be highly qualified for the position; therefore, the examiner does not believe it is clear, from this comparison, that [Page] is better qualified than the [appointee] for the position in question.

*In re Complaint of Carl F. Page*, Dec. No. PH071380132, slip op. at 13 (July 12, 1978).

The examiner also observed "that the selection process was highly subjective," and suggested improvements to reduce "the great margin of subjective inconsistency among the panel members' evaluation of the candidates." *Id.* at 12.

The examiner's ultimate conclusion that on the record he reviewed there was a rough toss-up in objective qualification factors tends to confirm rather than to draw into question the district court's assessment that the articulated reason was "legitimate," *i. e.*, was not manifestly at odds with objective indicators—not pretextual on its face. *See Wright*, 609 F.2d at 714 n.13.

the burden of persuasion on the ultimate issue of intentional discrimination remains throughout on the claimant, at this stage in the proof analysis his "required proof of discriminatory motive has in effect been narrowed and focused upon the specific reasons advanced by the employer . . . , but the underlying requirement remains to prove that the real as opposed to now specifically 'articulated' reasons was a racially inspired intent to treat less favorably." *Wright,* 609 F.2d at 716.

It was in this connection that the district court considered the postal authorities' asserted failure to follow the Postal Service guidelines for composing the promotion review committees. Looking specifically to the evidence regarding the way in which the committees were composed, the court found that there was no black employee in the Richmond Post Office who was qualified to serve on the PES–17 committee, and that following the failure of the appointed black member of the PES–18 to serve, there was no reasonable replacement available at the critical time. From this the court concluded:

> Though neither the first nor second Review Committee contained a minority member, "every effort" was made to obtain one for the second meeting. This lack of a minority member must be weighed against the proper questions asked the applicants, the obvious concern by the Committee members for the applicant's ability to do the job, and the lack of bias on the part of the Committee members. Further, no law requires that there be any particular racial composition in Review Committees.

*Page v. Bolger,* No. CA–77–0400–R (E.D.Va. Aug. 16, 1978).

■ We think that this properly addressed the "pretext" inquiry and, again, we can find no reversible error of fact or law in the district court's conclusion that the articulated reason of better relative qualification was not a mere pretext. In addition to the fact that this finding rested largely upon assessments of credibility and the resolution of conflicting permissible in-

ferences—matters on which we are commanded by Fed.R.Civ.P. 52(a) to accord great deference to the trial judge's superior vantage point—we think there is evidence other than the testimony of the decisionmakers that supports the finding. As a result of possibly questionable conduct by one of the original PES–18 committee members, the district manager directed reconstitution of the committee to avoid any real or suggested racial bias. When no qualified black employee was available to serve on it from the local post office, one from a relatively distant post office was appointed in an effort to insure minority representation. These actions were directly relevant to the pretext inquiry—as conduct of the employer probative of likely motivation for the ultimate employment decisions. *See Furnco,* 438 U.S. at 580, 98 S.Ct. at 2951; *McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825; *Wright,* 609 F.2d at 716–17.

■ In summary, when the district court assessed the evidence under the *McDonnell Douglas* formula—a mode of analysis which both parties agreed in the trial court was appropriate—it found: (1) claimant's prima facie case established; (2) the inference of discriminatory intent thereby raised effectively dispelled by defendant's articulation of a "legitimate nondiscriminatory reason," *i. e.,* better relative qualifications of others; and (3) this reason not shown to be a mere pretextual cover for discriminatory motive behind the decisions not to promote. In this process, we think the court adhered faithfully to the appropriate mode of analysis and to the issues as framed by the pleadings and addressed in proof by both parties. Bearing in mind that under the disparate treatment theory relied upon by claimant the burden of persuasion remained with him throughout to prove by a preponderance of the evidence that he was "treated less favorably than others because of [his] race," *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 & n.15, 97 S.Ct. 1843, 1854 & n.15, 52 L.Ed.2d 396 (1977), in respect of specific "personnel actions," 42 U.S.C. § 2000e–

16(a), we conclude that the district court's findings of fact and conclusions of law against the claimant on this ultimate issue were neither erroneous in law nor clearly erroneous in fact.

## III

Apparently realizing that under this mode of analysis the district court's assessment of the evidence is probably unassailable on review, Page has urged on appeal a modification of the *McDonnell Douglas* formula, which it is contended will better serve the remedial purposes of Title VII in the particular factual context of this case. Briefly summarized, this modification would focus the *McDonnell Douglas* inquiry upon the process by which the review committees were constituted, and would make decisive in claimant's favor the fact that— in asserted violation of the plain intent of the Postal Service's internal guidelines [9] —they included no minority members. The specific modification urged is that used by the panel majority, which first heard this appeal, as a basis for finding reversible error in the district court's assessment of the evidence. Under it the claimant would establish a prima facie case by showing that (1) he belonged to a minority; (2) he qualified for the position; and (3) he was denied promotion because of an evaluation by a review committee consisting of only white males. At this point the employer would be required to articulate some nondiscriminatory reason *for the absence of a minority member on the review committee.* If this were done, the pretext inquiry would then focus on this reason, rather than the articulated reason for denying the promotions.

This modification is claimed to be justified because the *McDonnell Douglas* analytical framework has been recognized as a flexible one requiring adaptation to different fact patterns, *see Furnco*, 438 U.S. at 575–76, 98 S.Ct. at 2948–49. It is claimed to be required by the fact that here the affirmative action guideline asserted to have been violated has the force of law as a regulation.[10]

■ We reject this as an appropriate basis for analyzing the evidence in this case. While we recognize that the *McDonnell Douglas* proof scheme is not to be given a wooden application that loses sight of its essential purpose as merely a "sensible, orderly way to evaluate the evidence," *Furnco*, 438 U.S. at 577, 98 S.Ct. at 2949, we are satisfied that the modification here urged would amount to a complete substantive shift of focus from the appropriate object of inquiry where employment discrimina-

---

**9.** *See* text at notes 2–4 *supra.* The Postmaster General does not concede that the guidelines have in any event been violated. On the contrary, pointing to the admonitory language which imposes only the "responsib[ility] for making every effort to select at least one ... minority ... member" for review committees, Postal Service, *Personnel Handbook* § 544.2, he contends that the evidence shows compliance. In view of our disposition of the appeal, we have no need to address this question.

**10.** The contention is that the Postal Service's *Personnel Handbook* provisions enjoining "every effort" to insure minority representation on the review committee, *see* note 9 *supra*, traces its lineage to statutory mandate.

Section 717(b) of Title VII, 42 U.S.C. § 2000e–16(b), authorizes the Civil Service Commission to enforce the substantive antidiscrimination provisions of subsection (a); delegates rulemaking power for the purpose; and directs compliance by covered agency heads. Pursuant to the statutory mandate, the Civil Service Commission has promulgated regulations, 29 C.F.R. §§ 1613.201–.643 (1979), which

require the head of the Postal Service, along with other agency heads, to establish "a continuing affirmative action program," 29 C.F.R. § 1613.203, and specifically to "[c]onduct a continuing campaign to eradicate ... discrimination ... from the agency's personnel policies and practices and working conditions, ...." 29 C.F.R. § 1613.203(b). The Postal Service's *Personnel Handbook*, is thus arguably a part of the Postal Service's regulations, which, tracing their lineage to § 717(b), has the force of law.

For purposes of this appeal we can accept this proposition. That, under *United States v. Caceres*, 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979), the regulation therefore would be entitled to enforcement by a federal court, does not in our view mean that, if violated, its violation must be redressed as if it constituted a direct violation of substantive provisions of Title VII. On this appeal we have no occasion to consider other means by which, if violated, it might have been enforced in Page's behalf.

tion by disparate treatment is claimed. Aside from the fact that this contention in effect introduces on appeal a new and dispositive theory neither advanced nor considered in the district court, its adoption would constitute an erroneous departure from settled and fundamental substantive principles under Title VII.

The proper object of inquiry in a claim of disparate treatment under § 717 is whether there has been "discrimination" in respect of *"personnel actions* affecting [covered] employees or applicants for employment .... "  42 U.S.C. § 2000e–16(a) (emphasis added).  Disparate treatment theory as it has emerged in application of this and comparable provisions of Title VII, most notably § 703(a)(1), 42 U.S.C. § 2000e–2(a)(1), has consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating.  This is the general level of decision we think contemplated by the term "personnel actions" in § 717.  It is the level focused upon in the major Supreme Court decisions establishing and refining the substantive and procedural elements of individual disparate treatment theory.  *See, e. g., Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 24–25 & nn.1 & 2, 99 S.Ct. 295, 295–296 & nn.1 & 2, 58 L.Ed.2d 216 (1978) (failure to promote); *Furnco,* 438 U.S. at 576–77 & n.8, 98 S.Ct. at 2949 & n.8 (failure to hire); *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (same).  *See also* B. Schlei & P. Grossman, *Employment Discrimination Law* 15 (1976).  It is the level upon which the district court in the instant case—with the acquiescence there of both parties—focused the *McDonnell Douglas* analysis.  As seems plain from the record, the court and the parties were there agreed that the "personnel actions" in issue were the decisions denying to Page and giving to others the positions that each sought and only one could be given.  These were the decisions to which it was thought Page's prima facie showing of discriminato-

ry motive was properly addressed and weighed.  It was clearly these decisions for which a "legitimate, nondiscriminatory reason" was sought in defendant's rebuttal evidence.  Finally, it was these decisions whose nondiscriminatory quality was considered in issue for purposes of assessing the possible "pretextual" nature of the reasons given for them by the defendant.  As earlier indicated, we are satisfied that the *McDonnell Douglas* analysis—originally developed and applied with focus upon a hiring decision—was perfectly suited for application without significant modification to the comparable level of decisions in the instant case.

By this, we suggest no general test for defining those "ultimate employment decisions" which alone should be held directly covered by § 717 and comparable antidiscrimination provisions of Title VII.  Among the myriad of decisions constantly being taken at all levels and with all degrees of significance in the general employment contexts covered by Title VII there are certainly others than those we have so far specifically identified that may be so considered— for example, entry into training programs, *Wright,* 609 F.2d at 712 n.10.  By the same token, it is obvious to us that there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions of § 717 and comparable provisions of Title VII.  We hold here merely that among the latter are mediate decisions such as those concerning composition of the review committees in the instant case that are simply steps in a process for making such obvious end-decisions as those to hire, to promote, etc.

To apply the modified *McDonnell Douglas* analysis urged by Page would do much more than merely modify a procedurally tidy proof scheme.  Its practical effect would be a profound substantive one by which these mediate decisions were drawn within the coverage of those "personnel actions" directly covered by § 717.[11]  By this

11.  This would occur in the following way.  Under the straight *McDonnell Douglas* analysis

used by the district court, with denial of pro-

means a proven violation of the Postal Service's statutorily mandated "affirmative program," 29 C.F.R. § 1613.203, designed to eradicate discrimination, 29 C.F.R. § 1613.-203(b), would be made a violation of Title VII itself. Affirmative action undertakings by government employers would come in practical terms to define the standards for compliance with Title VII's antidiscrimination provisions. We do not think this could accord with Congressional intent. *See Wright*, 609 F.2d at 718.

*AFFIRMED.*

BUTZNER, Circuit Judge, with whom WINTER and SPROUSE, Circuit Judges, join, dissenting:

This case illustrates once again the racial discrimination black employees encounter when they seek advancement to the higher echelons of the federal establishment.[1] Although Carl F. Page was well qualified for the promotions he sought, he was twice denied advancement by illegally constituted, racially segregated promotion review committees. Having failed to conform to a regulation designed to put an end to this practice, the Postal Service justified its refusal to promote Page by relying on the self-professed fairness of the members of its committees. The district court accepted this testimony as dispositive of this case.

Abuse of the power to select review committees, coupled with the improbability that any federal official is likely to confess that he discriminated on the basis of race in recommending a promotion, has enabled the middle ranks of the postal bureaucracy to erect an almost impregnable barrier to the goal of equal opportunity that Congress

sought to achieve. This barrier should be breached by rejecting as a basis of decision the self-serving, subjective testimony of the illegally appointed committee members. Employees protesting racial discrimination with respect to promotion should prevail when, upon proper analysis of the evidence, they prove that the Postal Service has violated the regulation that was intended to abolish racially segregated review committees.

**I**

The Postal Services' *Personnel Handbook*[2] provides that a review committee shall be designated to screen the applicants for promotion to positions classified within the postal executive salary level (PES) and recommend the "most outstanding candidates" to the appointing officer, who in this case was the postmaster.[3] The committee must consist of at least three members.[4] Section 544.2 of the *Handbook* requires the appointing officer to make "every effort" to assure diversity in the committee. It states in part:

> The official who designates a review committee is responsible for making every effort to select at least one woman and/or one minority group member. In the absence of available women and/or minority employees at the appropriate level, committee members must be furnished by the next-higher organizational unit, where available.

The genesis of this regulation is found in the 1972 Amendments of Title VII of the Civil Rights Act of 1964. Section 717 of Title VII as amended[5] provides in subsec-

---

motion taken as the focus of inquiry, the composition of the review committee is significant, perhaps highly so, but only as it relates to the pretextual nature of the reason given for the denial of promotion, as to which the claimant has the burden of proof. Under the modified analysis, the focus of inquiry would shift completely to composition of the review committee, with the burden imposed upon the employer to justify that composition at peril of being found in violation of the substantive prohibitions of § 717(a).

1. *Wright v. National Archives*, 609 F.2d 702, 718–19 (4th Cir. 1979) (Butzner, J., dissenting), refers to the legislative history in which Congress concluded that the government had failed "to pursue its policy of equal opportunity."

2. Postal Service, *Personnel Handbook P–11*, TL–4 (Dec. 31, 1975).

3. *Id.* § 544.3–1.

4. *Id.* § 544.1–2.

5. 42 U.S.C. § 2000e–16.

tion (a) that "[a]ll personnel actions affecting employees . . . in the United States Postal Service . . . shall be made free from any discrimination based on race . . . ." Subsection (b) authorizes the Civil Service Commission to enforce the provision of subsection (a) and directs the Commission to "issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out its responsibilities under this section." The statute also provides that "[t]he head of each department, agency, or unit shall comply with such rules, regulations, orders, and instructions . . . ."

In compliance with the mandate of § 717, the Civil Service Commission promulgated regulations[6] in 1972 which require the head of each government agency, including the Postal Service, to establish, maintain, and carry out "a continuing affirmative program designed to promote equal opportunity in every aspect of agency personnel policy and practice in the . . . advancement . . . of employees."[7] A specific directive of the regulations provides that the agency shall "[c]onduct a continuing campaign to eradicate every form of prejudice or discrimination based upon race, color, religion, sex, or national origin, from the agency's personnel policies and practices and working conditions . . . ."[8] Further the agency must "[d]evelop the plans, procedures, and regulations necessary to carry out its program of [equal opportunity]."[9]

The regulations of the Postal Service include "[t]he Headquarters Manual, Regional Instructions, handbooks, delegations of authority, and other regulatory issuances and directives of the Postal Service or the former Post Office Department."[10] Consequently, the Postal Service's *Personnel Handbook* is a part of the Service's regulations. The edition applicable to these proceedings was issued as Publication 194, entitled *Guide to Promotion and Reassignment,* in May 1975.[11] The *Guide's* release was announced in Postal Bulletin 21038 which states that it will govern "all promotions and reassignments to covered positions . . . ." A memorandum from the Eastern Regional Postmaster General dated June 6, 1975, directed every manager to follow it in filling PES positions. The memorandum offered "any assistance needed for implementing this vital program affecting our employees." The *Guide* was incorporated in the *Personnel Handbook* §§ 540 to 553 on December 31, 1975.

In *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979), which dealt with the application of the exclusionary rule to evidence obtained in violation of an agency regulation, the Court said, "A court's duty to enforce an agency regulation is most evident when compliance with the regulation is mandated by the Constitution or federal law." This principle is applicable to Page's claim. The equal protection component of the fifth amendment's due process clause bars federal agencies from discriminating against their employees because of race. Congress implemented this constitutional provision by enacting the Equal Opportunity Act of 1972.[12] The lineage of the *Handbook* can be traced from § 717 of this Act,[13] through the Civil Service regulations,[14] and the Postal Ser-

---

**6.** These regulations have been codified in 5 C.F.R. §§ 713.201 to 713.643 (1978).

**7.** 5 C.F.R. § 713.203.

**8.** 5 C.F.R. § 713.203(b).

**9.** 5 C.F.R. § 713.204.

**10.** 39 C.F.R. § 211.2(a).

**11.** Section 544.2 of the *Handbook* is designated as ¶ C(4) of the *Guide.* A Postal Service employee testified that the *Guide* was initially issued in 1973. He added that prior to its issuance there had been "many accusations of favoritism in the selection of people for promotion."

**12.** Pub.L.No.92–261, 86 Stat. 103 (March 24, 1972), 42 U.S.C. § 2000e *et seq.* (1972).

**13.** 42 U.S.C. § 2000e–16. *See* text at n.8, *supra.*

**14.** 5 C.F.R. §§ 713.203 and 713.204. *See* text at nn.9–12, *supra.*

vice's regulations.[15] Thus, it is apparent that § 544.2 of the *Handbook,* pertaining to the racial composition of review committees, was promulgated to enforce the fifth amendment and § 717 of Title VII. Therefore, in accordance with *Caceres,* § 544.2 of the *Handbook* is mandatory, and the Postal Service was under a duty to follow it.

It was error for the district court to buttress dismissal of Page's claim on its ruling that "no law requires that there be any particular racial composition in Review Committees." While it is true in a literal sense that Congress did not enact the regulation, it specifically required the promulgation of regulations to implement § 717 of Title VII. The regulation therefore has the force of law.

It is also true that the regulation is procedural, but this affords no justification for refusing to afford Page its protection in his effort to attain promotion. Procedural rights are not second class rights. Their enforcement is essential to the preservation of substantive rights. *Anti-Fascist Committee v. McGrath,* 341 U.S. 123, 149–74, 71 S.Ct. 624, 636–50, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

The regulation embodied in § 544.2 was promulgated to protect the substantive rights of black postal employees, secured by the fifth amendment and Title VII, to be free of racial discrimination in the selection of applicants for promotions. As Parts II and III of this dissent demonstrate, denial of Page's procedural right to be judged by a review committee that was not illegally segregated according to race, defeated his substantive right to be considered for appointment regardless of his race.

## II

Although § 544.2 does not require every review committee to have a minority member, it places on the official designating the committee the responsibility of making "every effort" to select such a member. Moreover, in the absence of a qualified minority employee at the local level, "members must be furnished by the next-higher organizational unit, where available." [16]

Drawing on principles explained in *Furnco Construction Co. v. Waters,* 438 U.S. 567, 575–78, 98 S.Ct. 2943, 2948–50, 57 L.Ed.2d 957 (1978), "a sensible, orderly way to evaluate the evidence," [17] on this issue is as follows: (1) When a qualified, minority employee proves that a review committee was composed only of white males, (2) the Postal Service must articulate some legitimate, nondiscriminatory explanation for the absence of a minority member—that is, despite reasonable efforts to secure such a member, none was available. (3) The burden then shifts to the employee to establish that the "proffered justification is merely a pretext for discrimination." 438 U.S. at 578, 98 S.Ct. at 2950. To carry his burden, the employee must prove discriminatory motive which can be established by either direct or circumstantial evidence as well as by inference. *Teamsters v. United States,* 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973).

With regard to the PES–17 committee, the district court found that at the local level there was no black employee of suffi-

---

**15.** 39 C.F.R. § 211.2(a)(3). *See* text at n.13, *supra.*

**16.** *See* text at n.4, *supra.*

**17.** The Court pointed out that the allocation of the burden of proof was never intended to be "rigid, mechanized or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." 438 U.S. at 577, 98 S.Ct. at 2949. Although *Furnco* and its antecedent, *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), dealt with a different factual issue, we believe their method of analysis, modified to reflect the facts, is appropriate here. *See Furnco,* 438 U.S. at 575–76, 98 S.Ct. 2948–49. "Presumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof." *Teamsters v. United States,* 431 U.S. 324, 358 and 359 n.45, 97 S.Ct. 1843, 1866 and 1867 n.45, 52 L.Ed.2d 396 (1977).

cient rank qualified to serve. Page asserts that this finding should be set aside because the postmaster testified that he would have furnished a black station master had he been asked to do so. Page's argument must be rejected because the Postal Service presented testimony that station masters, although of sufficient rank, lack the necessary experience. Page did not show that this explanation was a pretext. Applying the analysis adopted from *Furnco*, the district court's finding must be accepted.

The designating officer's duty, however, was not discharged by simply canvassing the local level. Section 544.2 obliged him to secure a minority member from the next higher organizational unit, where available. The record does not disclose, and the Postal Service does not contend, that any effort was made to obtain a black employee from the next higher level. Since the Service has articulated no reasonable explanation for not selecting a minority member from a next higher organizational unit, it is apparent that it has not satisfied step 2 of the modified *Furnco* analysis. The Postal Service therefore did not comply with § 544.2 when the PES–17 committee was named.

The district court's findings and conclusions concerning the composition of the second PES–18 committee are based largely on the administrative hearing transcript and the decision of the appeals examiner which were made a part of the record of this civil action. The administrative record discloses that a black employee from Richmond and another from Norfolk were qualified to serve on review committees. The Postal Service offered an explanation for the absence of the Richmond employee, which Page did not show was a pretext. The Service satisfied the modified *Furnco* analysis, and we find no failure to comply with § 544.2 because the Richmond employee was not designated to serve on the committee.

The examiner noted that neither Page nor the Postal Service had offered evidence to show the availability of the Norfolk employee, who also was from the local level. The examiner ruled against Page on this point. This ruling was erroneous. It is undisputed that the PES–18 committee was composed of white males. Consequently, the burden was on the Service, not Page, to articulate some legitimate explanation why the Norfolk employee had not been selected.

Furthermore, when the black employee from the Eastern Regional Office became unable to serve on the PES–18 committee, a white employee was substituted. At the administrative hearing, the Postal Service offered no explanation for the substitution of a white employee when the designating officer specifically had requested a black employee in order to comply with § 544.2. There is no suggestion in the administrative record that another black employee from the Regional Office was not available. The examiner's ruling against Page on this point was erroneous. The substitution of a white employee for the black committee member, absent some reasonable explanation for the change in the racial composition of the committee, does not satisfy step 2 of the modified *Furnco* analysis. At the de novo hearing, the Postal Service did not supplement the record to remedy the deficiencies of its position at the PES–18 administrative hearing. Therefore, the district court's reliance on the administrative record and decision was misplaced.

The Postal Service did not comply with § 544.2. The review committees, which weighed the relevant qualifications of Page and the successful appointees for the PES–17 and 18 positions, were constituted improperly with respect to race.

### III

Once it is concluded that the Postal Service assembled racially segregated review committees in violation of anti-discrimination regulations which had the force of law, it is a simple matter to fit that conclusion into the traditional *McDonnell Douglas* formula. The district court found, and the Postal Service now concedes, that Page proved a prima facie case of discrimination in accordance with the familiar *McDonnell Douglas* analysis. In *Texas Department of*

Community Affairs v. Burdine, —— U.S. ——, —— – ——, 101 S.Ct. 1089, 1092–95, 67 L.Ed.2d 207 (1981), the Court reviewed the allocation of burdens and order of presentation of proof prescribed by *McDonnell Douglas*. In the following terms it explained the defendant's obligation after the plaintiff had proved a prima facie case:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.

The Postal Service failed to satisfy this test. Its explanation for deeming the white applicants superior to Page rested on the evaluation of the applicants by racially segregated review committees that were appointed in violation of the regulations governing their function. An employer's reliance on the subjective judgment of individuals whose power to make an employment decision exists only by virtue of a flagrant disregard for mandatory anti-discrimination regulations cannot suffice as a legitimate non-discriminatory reason for the action. Since the Postal Service seeks to justify its action only by reliance upon its own unlawful conduct, Page's prima facie case stands unrebutted. Under these circumstances, neither *McDonnell Douglas* nor *Burdine* requires Page to prove in addition that the ratings made by the illegally constituted committees were a pretext. He is entitled to prevail on the basis of his unre-

butted prima facie case. *See Burdine*, —— U.S. at ——, 101 S.Ct. at 1095.

It is certainly true that nothing in Title VII prohibits an employer from relying on subjective criteria in taking personnel actions. Indeed, in employment decisions regarding supervisory-level personnel in government as well as in private business, subjective factors inevitably play a major role. Where subjective judgment forms the basis of an employment decision, however, discriminatory motive, an essential element of the cause of action, is particularly difficult to unearth. In such instances safeguards designed to protect the integrity of the decision making process take on paramount significance.

It is precisely for this reason that § 544.2 of the Postal Service *Personnel Handbook* came into being. Through § 544.2 Congress and the Service have defined the "legitimate" procedure for subjective decision making. The court should enforce that congressional and administrative judgment by refusing to consider the subjective judgment of an unlawfully constituted review committee as a legitimate reason for a personnel action. To do anything less is to eviscerate the protection provided by Title VII to those whose abilities and aspirations have led them to the higher levels of government service. Because the evidence established that the Service failed to comply with the *Handbook*, the court should recognize the compelling inference that impartiality, which Congress and the agency sought to assure, has been frustrated.

The allocation of burdens of proof and the order of presentation of evidence explained in *McDonnell Douglas* and clarified in *Burdine* were not designed to jettison regulations governing promotions. On the contrary, the analysis of proof prescribed by these cases is appropriate for enforcing the substantive rights granted by Title VII through application of procedural regulations formulated to eradicate discrimination. This does not mean that a Title VII plaintiff will automatically prevail whenever an employer violates an anti-discrimina-

tion regulation at any step in the decision making process. It simply requires the employer to articulate a justification for his actions that does not depend on the tainted procedures.

The judgment of the district court should be reversed, and this case should be remanded with directions to grant Page appropriate relief.[18]

**18.** The superseded panel opinion outlined the nature of the relief to which Page was entitled without "bumping" the successful applicants who were innocent of any complicity in the Postal Service's illegal designation of review committees. *Page v. Bolger*, No. 78–1792, slip op. at 17–21 (4th Cir. Dec. 19, 1979).