Paul L. STEWART

v.

UNIVERSITY OF PITTSBURGH WESTERN PSYCHIATRIC INSTITUTE AND CLINIC.

Civ. A. No. 78–1361.

United States District Court,
W. D. Pennsylvania.

Aug. 24, 1981.

Louis J. Carr, Jr., C. Timothy Stoner, Pittsburgh, Pa., for plaintiff.

James J. Restivo, Jr., Diane M. Perer, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## OPINION

ROSENBERG, District Judge.

This action was brought by Paul L. Stewart, a former employee of the defendant, University of Pittsburgh, Western Psychiatric Institute and Clinic. The action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981 and the Fourteenth Amendment of the United States Constitution. His claim is for injunctive relief for reinstatement to his former position and damages because the defendant deprived him of rights to employment to which he was entitled by law. Primarily, he charges the defendant with racial discrimination against him as an American negro.

At the trial of this case, non-jury, the plaintiff produced a number of witnesses who testified that he held the position of Specialty Counselor Associate in the Methadone Program of the Comprehensive Drug Abuse Treatment Program Division. This is part of the Western Psychiatric Institution, associated with all the hospitals in the Medical Center of the University of Pittsburgh.

The methadone center was set up particularly for the treatment of drug addiction victims and it dispensed methadone in an effort to counteract the damage to human beings who were addicted to the use of heroin. The center is part of the Psychiatric Institute and had Dr. Usim Odim as the head of the Drug Abuse Program. This center was under the supervision of Dr. John Wolford who was the Director of Community Mental Health Center and the Director of Adult Services. Both had the power to hire and fire, but Dr. Odim was entrusted with the orderly functioning of the center and was charged with control, discipline, direction and guidance of employees and was responsible for their accomplishments in the center. Additionally, and interconnected with the assignment of employment, was Dr. Bishop, subsequently married and now Dr. Bishop Coffey. She was and is an assistant to the Chancellor of the University of Pittsburgh and charged with the implementation of the Affirmative Action Program and employment of all the facilities. When transfers were to be made from one part of the University setup to another, Dr. Coffey would be the appropriate source through whom such activities were processed. Transfers were made only after special application by an individual in accordance with the rules and regulations of the Institute.

The plaintiff asserted in his testimony that on April 30, 1976, a meeting was held in the office of Dr. Odim of the center staff and that at that time the plaintiff attempted to set Dr. Odim right by making certain suggestions but Dr. Odim resented his suggestions and attempted to put the plaintiff in his place. The plaintiff resisted and he, the plaintiff, was then ushered out of the room by two members then present. From that time on, the plaintiff charges Dr. Odim was prejudiced against him and directed him in the performance of certain matters

which the plaintiff resented. This the plaintiff said was all brought on by reason of the fact that the plaintiff had been absent and had brought a doctor's excuse prior to the April 30th meeting. Dr. Odim refused to accept the excuse on three different occasions and became belligerent against the plaintiff. At the same time, the plaintiff asserts, Dr. Odim uttered a racial slur against him as an American negro.

On another occasion Dr. Odim refused to let the plaintiff speak at a symposium and that was reversed by Dr. Wolford. On another occasion, Dr. Odim called the plaintiff into his office and upbraided him for something that he did not explain was the cause for being called into the office.

The defendant in its testimony produced evidence that Dr. Odim was a Nigerian by birth and a psychiatrist; that he had the training which fitted him for the position which he held; that he was responsible for the results which the center was required to produce and responsible for employee functioning; that he was obviously a black man and that he had no prejudice against the plaintiff at any time; that he had consulted with Dr. Wolford in regard to all matters and particularly that of the plaintiff so far as any action that was taken by him; that his disciplining of the plaintiff was a part of his duties; that the entire staff comprises approximately 75% black employees; that Dr. Odim did not apply any odious names to the plaintiff; that he believed the plaintiff needed a three-day leave of absence for the purpose of getting control of himself; that the question of giving the plaintiff a 60-day leave of absence came up with Dr. Wolford and that this was an effort to stabilize the plaintiff; that the plaintiff took all of this in bad mood and showed his resentment; that the question of transfer of the plaintiff from the center to another division in the hospital would be looked into if the plaintiff desired it; that this occurred subsequently with Dr. Coffey and Mr. Burr, counsel for the University; Mr. Phillip Brown, representative of Human Resources and Mr. Clifford Cooper, attorney for the plaintiff present. The plaintiff was also present and this was the

way the meeting ended with action to be decided by the plaintiff; but from that time on the defendant heard nothing from the plaintiff. The evidence shows that if the plaintiff had desired a transfer, it was incumbent upon him to fill out the form which Dr. Coffey would have provided, and when a suitable place could be found for the plaintiff, it would be done.

Dr. Coffey is also of the black race. Dr. Coffey testified that there was no animosity, no prejudice and no partiality shown against the plaintiff; that he had these rights and could claim them whenever he wished but he never claimed them, especially when he had the right to do so in August. Dr. Coffey testified that the plaintiff was never dismissed by the University or the Western Psychiatric Institute and Clinic; but that after three months' absence on the plaintiff's work record, the University's internal audit had the plaintiff's name stricken from the payroll. That did not, however, necessarily mean that the plaintiff could not come back and make an application through Dr. Coffey subsequently. Dr. Coffey testified that the plaintiff was never dismissed as an employee.

Dr. Coffey's assertion was clarified by a letter written by the assistant counsel for the University, Attorney Keith Burr to the plaintiff indicating that there was no promise of transfer but that Dr. Coffey and Mr. Burr would use their best efforts to discover a possible transfer for the plaintiff. The evidence of the defendant is that the plaintiff never took advantage of his right to make such application for transfer or for reinstatement, since after October 14th he was required to contact Mr. Brown for reinstatement. The plaintiff did not rebut this evidence.

The issue presented by the parties here is rather simple. Was racial discrimination practiced to the extent that would have compelled the plaintiff to remove himself from the position as a matter for his own protection, safety, or even comfort and benefit? While it may be true that there can be antagonisms between one white person

and another white person, it is equally true that there can be antagonisms between one black person and another black person. And it very well could be that Dr. Odim, a Nigerian, black psychiatrist, felt himself superior to the plaintiff. It could as well be true that the plaintiff resented Dr. Odim's superiority and believed that he as an American negro was equally as good as a Nigerian black man, even a psychiatrist. Such feelings could, of course, provide for discriminatory actions by the superior power, Dr. Odim here, against the inferior individual the plaintiff, Paul Stewart.

It was this particular sense of antagonism that I looked for in the case and attempted to extract from all the evidence as it was presented. I could not find any more prejudice on the part of Dr. Odim against the plaintiff as an American negro than I could find against the other 15 of 20 staff members who were also American negro employees. There was no evidence whatsoever that Dr. Odim had any prejudice against any other of these American negroes; and this is good evidence that he did not particularly select the plaintiff for a victim of color prejudice.

It is my belief that the plaintiff showed as much antipathy against Dr. Odim as Dr. Odim might have showed against him, and that Dr. Odim did not accept any breach of discipline from the plaintiff any more than he might have accepted it from any of the other 70% black American negroes under his authority or for that matter against the other five white employees under his authority.

This conclusion by me is strengthened by the testimony of Dr. Coffey, a black woman, as I stated before. Dr. Coffey was a highly impressive witness, an educator and a person whose demeanor on the stand was convincing. She spoke plainly, simply, both in direct and cross-examination, to the effect that Dr. Odim was not prejudiced against the plaintiff. Dr. Coffey stated that any action on the part of any employees with whom she was associated was definitely not done on the basis of race or color. She testified that the plaintiff would have

continued his job if he had returned to work on September 1st, but he failed to do so. Thus, I cannot conclude that he was dismissed. I further conclude that the plaintiff, for whatever reason he did, seemed to have been uninterested in going back to the University and returning to his job or even claiming a transfer. This case does not fall within the principles of law upon which the plaintiff stands.

The plaintiff cites *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) as establishing the criteria for a prima facie case of discrimination in employment. The plaintiff's interpretation of this criteria to be applied to discharge from employment is that:

1. The plaintiff be a member of a protected group;

2. The plaintiff was discharged or otherwise penalized by the employer;

3. The plaintiff was qualified to do the job; and

4. The plaintiff was satisfactorily performing his job.

The plaintiff further contends that if he is found not to have been discharged, then he was "constructively discharged", which occurs when an employer "deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Young v. Southwestern Savings and Loan Association*, 509 F.2d 140, 144, C.A. 5, 1975.

 Even if the plaintiff's interpretation of the *McDonnell Douglas* criteria for a prima facie case is correct, the evidence indicates that he has not met these criteria. While the plaintiff, a black man, is a member of a protected group, the evidence clearly indicates that he was not discharged, but failed to take advantage of the opportunities open to him to return voluntarily to his job, if he wished a transfer to make application for such through Dr. Coffey. Furthermore, the plaintiff was not "constructively discharged" as defined in the *Young* case, *supra*; any actions taken by the University officials with regard to the plaintiff were for good cause and pursuant to procedures

prescribed in the University of Pittsburgh Staff Handbook. While the evidence indicates that the plaintiff was qualified to do the job, the evidence also indicates that he was not satisfactorily performing his job, because he presented himself as a disciplinary problem, being both disruptive and insubordinate. The plaintiff, therefore, has not met the criteria that he himself has put forth as essential to establishing a prima facie case of discrimination.

Assuming *arguendo* that the plaintiff did in fact prove by a preponderance of evidence a prima facie case, then the plaintiff would be required to meet the standards of proof set forth in the *McDonnell Douglas* case, *supra*, which were re-addressed in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) as follows:

1. The plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination.
2. The defendant then has the burden of articulating some legitimate non-discriminatory reason for the actions taken against the employee.
3. The plaintiff then must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true, but were a pretext for discrimination; and this the plaintiff can do by either persuading the court that a discriminatory reason more likely motivated the employer, or by showing that the employer's proffered explanation is unworthy of credence.

Even if the plaintiff had established a prima facie case of discrimination, the defendant has in fact met its burden of articulating non-discriminatory reasons for its actions, by showing a breach of discipline, insubordination and disruptive behavior by the plaintiff. The plaintiff, in rebuttal, has not shown either that a discriminatory reason was more likely or that the defendant's explanation is without credence. Even by this principle of applied evidence, the plaintiff failed to meet his burden of proof in the case.

In his trial memorandum, the plaintiff cited the case of *Page v. Bolger*, 645 F.2d 227 (C.A.4, 1979), as standing for the proposition that where an employer fails to follow its own administrative procedures, a discriminatory motive may be inferred. The plaintiff alleges that the University failed to follow its own procedure as set forth in the University of Pittsburgh Staff Handbook and that therefore a discriminatory motive can be inferred.

The *Page* case is not applicable here because in that case a black Postal Service employee failed to obtain a promotion from an improperly constituted, all-white review committee. The court there based its decision upon enforcement of § 717 of Title VII, 42 U.S.C. § 2000e–16(a) and (b), which prohibits discrimination in all Federal Government employments with particular reference to the United States Postal Service. It is inapplicable here because that law does not relate to the defendant in the instant case. Additionally, even if the *Page* case could be considered applicable here, the evidence shows that the University did follow its own administrative procedures with regard to the plaintiff.

The plaintiff failed to show from all the evidence in the case that the defendant actually was prejudiced against him, or that the defendant dismissed him at all. Accordingly, the plaintiff has not presented a case under any of the authorities upon which he relies.

Judgment will be rendered for the defendant, University of Pittsburgh, Western Psychiatric Institute and Clinic.

The Findings of Fact and Conclusions of Law are incorporated in this Opinion in accordance with Federal Rule of Civil Procedure 52.

## ORDER OF COURT

AND NOW, TO–WIT, this 24th day of August 1981, for the reasons set forth in the foregoing Opinion, judgment is hereby rendered in favor of the defendant, University of Pittsburgh, Western Psychiatric In-

stitute and Clinic, and against the plaintiff, Paul L. Stewart.