**Wanda O. SCOTT and Jerry L. Wall, Plaintiffs,**

v.

**WESTERN STATE HOSPITAL, Defendant.**

**Civ. A. No. 83–0050–C.**

United States District Court, W.D. Virginia, Charlottesville Division.

April 7, 1987.

Earl R. Burton, Charlottesville, Va., for plaintiffs.

Neil A.G. McPhie, Asst. Atty. Gen., Richmond, Va., for defendant.

## MEMORANDUM OPINION

MICHAEL, District Judge.

Plaintiffs, Wanda O. Scott and Jerry L. Wall, two black former employees of Western State Hospital, brought this action against the Hospital under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the Civil Rights Act of 1866, 42 U.S.C. § 1983. Scott alleges that the Hospital discriminated against her because of her race when it failed to promote her to a Clinical Social Worker C position. Wall alleges that he was harassed by Hospital staff members because of his race. For the reasons discussed below the court finds that Scott and Wall have failed to prove their allegations, and the court will therefore enter judgment for the Hospital.

### Plaintiff Wanda O. Scott

Wanda O. Scott, a black female, was hired by Western State Hospital on December 2, 1968, as a Social Service Aide B. From 1973 to 1975, Scott attended graduate school on a state scholarship, earning a master's degree in social work. She returned to fulltime work at Western State Hospital in March 1975 as a Case Worker, a position classified as a Clinical Social Worker B.

On July 1, 1976, the Shenadoah Geriatric Treatment Center (SGTC) was established as a separate unit within Western State Hospital. Scott was appointed as Director of Social Work of SGTC. This new position involved supervisory responsibilities beyond those of a Clinical Social Worker B.

Scott continued in this position until October 27, 1980, when she resigned from the director's duties as part of a protest by social workers at the Hospital. These resignations were part of a pattern of actions conceived by social worker Brendan Buschi. The concerted activity, which included the filing of multiple grievances, culminated in the July 14, 1981, dismissal of several social workers, including plaintiffs Scott and Wall.[1]

Two months after Scott resigned the director's duties in October, 1980, a Clinical Social Worker C position was approved for the SGTC. Scott applied for the position, and was one of five finalists interviewed for the job. The position was given to Ruth Cook, a white woman. Scott alleges that the failure to promote her to the position was based on race.

The burden of proof in a disparate treatment case is allocated according to the rules of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, a plaintiff must produce sufficient evidence to establish a *prima facie* case of discrimination. The burden of production then shifts to the employer to articulate a legitimate nondiscriminatory reason for rejecting the plaintiff. The burden of production then returns to the plaintiff to prove that the employer's stated reasons were actually a pretext for discrimination. The *McDonnell Douglas* rules are an analytical framework for examining evidence. The burden of persuasion always remains on the plaintiff, who must prove by a preponderance of the evidence that her employer intentionally discriminated against her because of her race.

■ Usually, to make out a *prima facie* case, the plaintiff must show that (1) she belonged to a racial minority; (2) she applied and was qualified for the promotion she sought; (3) she was denied the promotion; and (4) the position remained opened and was later filled by the employer from another applicant possessing the same general qualifications. *Page v. Bolger*, 645 F.2d 227, 229 (4th Cir.1981) (en banc). There is no question that Scott has established the first three elements. She is black, she applied for promotion to a position which she had in effect held for four years, and she was denied the promotion. Here, of course, Scott cannot prove that the vacancy remained open since Cook was appointed to the position at the time it became available. She must therefore present some other evidence that her race was a factor considered by the Hospital in not granting her the promotion. *Holmes v. Bevilacqua*, 774 F.2d 636 (4th Cir.1985) (en banc). The court finds that Scott has met this burden by showing that (1) she performed duties outside her job description for over four years; (2) two months after she resigned the extra duties, a new upgraded position was established, involving the same duties; and (3) she was not promoted to the upgraded position. Although Title VII does not require the employer to prefer an employee who has actually performed the duties of the job he seeks, *Chaves v. Thomas*, 35 F.E.P. 397 (D.D.C. 1984) [Available on WESTLAW, DCT database], the facts as stated here are sufficient to support an inference of discrimination. Scott has therefore met the burden of establishing a *prima facie* case.

■ The burden then shifts to the Hospital to articulate a legitimate nondiscriminatory reason for its failure to promote Scott. The Hospital offered abundant evidence that it was Scott's deficiencies as a manager, rather than her race, which cost her the promotion. Throughout the time that Scott served as Director of Social Work for the SGTC, she received written evaluations which criticized her managerial skills. In her response to these evaluations and other criticisms, Scott never suggested that they were racially motivated. To the contrary, in several instances Scott agreed with the criticisms.

■ Under *McDonnell Douglas*, Scott must show that the nondiscriminatory rea-

---

1. The Hospital also fired Brendan Buschi, Donald Vessey, Elizabeth Tsatsios, Dennis Draper, Susan Andrews, and Gary Hardley, all of whom are white. *Buschi v. Kirven*, 775 F.2d 1240, 1244 n. 1 (4th Cir.1985).

son offered by the Hospital for its decision not to promote her was a pretext for racial discrimination. Scott has failed to meet this burden. As noted earlier, Title VII does not require an employer to promote an employee simply because the employee has performed the duties of the position which she seeks. Moreover, here the evidence shows that Scott had performed the supervisory duties poorly. The record is replete with examples of poor management by Scott, including her failure to attend an important meeting about prescreening patients for transfer to Catawba Hospital, despite express instructions to do so; her failure personally to follow through on the Waynesboro project for placing discharged patients into the community; her late submission of a plan to restructure the Treatment Center's social worker department, a plan which by her own admission was based on the desires of individual social workers rather than the needs of the patients; her poor performance in contacting family members of patients involved in major accidents; her failure to attend community meetings; and her failure to enter into agreements with local boards to accept patients discharged from Western State Hospital.

Scott's deficiencies were noted by four different supervisors, Linwood Harding, Gloria deCuir, Paul Hundley, and Philip Denton. In her responses to these supervisors, Scott never suggested that their criticism of her performance was motivated by her race. Indeed, in many cases, she agreed with the criticism and expressed a commitment to improving her management skills. The record shows that these supervisors also criticized and disciplined white employees. Indeed, Scott stated specifically that Denton criticized all of the social workers in the SGTC, black and white alike. It was Denton, along with Scott's mentor, Brendan Buschi, who made the decision to give the Clinical Social Worker C position to Ruth Cook.

Cook's credentials were impressive. She held a Master of Divinity degree from Union Theological Seminary, a Master of Social Work from the Hunter School of Social Work and had studied at Columbia University. Unlike Scott, Cook was certified by the Academy of Certified Social Workers. Cook also had more years of experience as a social worker. Although Cook had less supervisory experience, she had performed well as a supervisor, while Scott had not. Denton testified that Cook also performed best of all the applicants in the interview.

After reviewing all the evidence, the court has concluded that Scott has failed to show that the reasons stated by the Hospital for its decision not to promote her were pretextual or that its decision was a product of racial discrimination.

■ In addition, there is no evidence to support Scott's allegation that the Hospital discriminated against her by not upgrading the position while she was acting as Director of Social Work for SGTC. The record shows that in 1977, Linwood Harding, on his own initiative, attempted to have Scott's position reallocated to a Clinical Social Worker C, but was unsuccessful for budgetary reasons. Moreover, during the time she served as director, Scott never requested an audit of her position, which would have been the appropriate step to initiate the reallocation process.

■ Likewise, there is no evidence that the Hospital discriminated against Scott when it required her to perform duties outside her job description. The evidence shows that white social workers also performed extra duties. Moreover, Scott was eventually given backpay for the extra duties, as the Hospital policy required.

■ Finally, Scott's allegation that the selection process itself was discriminatory lacks any basis in fact. The evidence shows that regulations required that the position be filled competitively, and that the appropriate supervisors determined that the position should be advertised publicly as well as within the Hospital. Due to an error at the central office in Richmond, the position was initially advertised only within the Hospital. Subsequently, the position was advertised publicly, prompting

protests and grievances from all of the in-house applicants. Despite assurances from Dr. Burns, the Director of the Hospital, that the in-house applicants would be considered for the position, they persisted in filing grievances, resulting in the establishment of an independent screening panel in Richmond to select the finalists for interview by the Hospital. Of the five finalists selected, four were already working at Western State Hospital, and two were black. Of the five applicants who were not selected as finalists, none was black.

In sum, there is no evidence that the selection procedure was unfair or discriminatory. To the contrary, the record shows that the Hospital treated the applicants fairly, despite the difficult circumstances created by Scott and other members of Brendan Buschi's dissident group.

*Plaintiff Jerry L. Wall*

■ Plaintiff Jerry L. Wall, a black male, worked for Western State Hospital as an Attendant B from June 1973 to June 1974, when he resigned to attend college. After graduating with a bachelor's degree in social work, he was rehired by Western State Hospital as a Social Worker B in October 1977. He remained in this position until July 1981 when he was dismissed for engaging in a concerted effort to disrupt the Hospital. Wall alleges that he was harassed by employees of Western State Hospital because of his race. The only specific instance of harassment cited by Wall to support his allegation concerns a memo written by nurse Rose Burgdorf and the response of Dr. Burns to Wall's complaints about the memo.[2] On January 23, 1981, Rose Burgdorf, a white nurse practitioner, wrote a memo to Dr. William Burns, Director of Western State Hospital, concerning proposed social work reorganization. The passages which Wall found objectionable are reproduced below:

> I know of specific instances on one of my units where nursing home beds have been lost due to inefficiency and lack of initiative on the part of the Social Worker. I know of many incidents where the Social Workers procrastinated regarding discussions with families of their relatives going to nursing homes.... I have personally witnessed some Social Workers who are not giving a fair 8 hours to Western State Hospital. Is this perhaps related to foot-dragging on discharge? In addition, one of our Social Workers has had state time to study nursing home administration. Is this not for his own personal gain? Aren't our tax dollars paying him to function as a Social Worker?

Although Wall was not named in the memo, he was in fact studying for his administrator's license at the time the memo was written. Wall contends that the memo was meant to refer to him, that the phrases "lack of initiative," "procrastinated," and "foot-dragging," are offensive racial stereotypes and that their use constitutes harassment. The court is aware that at one time, the lazy black was a stock character in entertainment in the United States, and that this cruel and inaccurate depiction of black workers fostered stereotypes which, although moribund, persist today. The court is equally aware that persons who are not members of a minority group are likely to be less sensitive to the discriminatory connotations of their language, and the court therefore believes that allegations such as those made here by plaintiff Wall should not be dismissed lightly. Accordingly, the court has scrutinized the memo and the record, particularly the testimony of Burgdorf. From this review of the evidence, the court has concluded that the memo was not racially motivated.

■ Even if the memo were racially motivated, it would not necessarily give rise to a cause of action against the Hospital. An employer is not an insurer against all racial

---

**2.** Wall presented no evidence at trial concerning an incident of physical harassment alleged in the complaint.

incidents in the workplace. Rather, an employer has a duty to investigate charges of harassment in the workplace by taking affirmative steps which are reasonable in the circumstances. *Friend v. Leidinger,* 588 F.2d 61, 67 (4th Cir.1978). Violation of this duty would constitute grounds for a harassment charge. Wall contends that Dr. Burns failed to take reasonable steps as required by law. The court disagrees.

 After Wall filed a grievance on February 6, 1981, charging Burgdorf with discrimination, Burns investigated the charge, heard testimony from Wall and other witnesses, and although he concluded that the memo was not discriminatory, he ordered that the memo be retracted, that Burgdorf apologize to Wall, and that she observe supervisory channels of communication in the future. Burns also referred the matter for investigation to the Office of Equal Employment Opportunity. Burns' effort to investigate the incident resulted in Wall filing another grievance on February 11, 1981, against Burns himself. Burns was also accused by the NAACP of trying to cover up the incident. When Jane Dowrick was dispatched by the central office in Richmond to investigate these charges, she in turn was accused of harassment.

This snowballing controversy was an outgrowth of the continuing disruption of the Hospital by the dissident social workers led by Brendan Buschi. *See Buschi v. Kirven,* 775 F.2d 1240 (4th Cir.1985). The evidence indicates that the Burgdorf memo was simply cannon fodder in the dissidents' ongoing campaign to disrupt the operation of the Hospital. Wall's decision to participate in the activities of this misguided group by abusing the grievance process ultimately resulted in his dismissal. Among the groundless grievances filed by Wall were the same harassment charges he pursues in this action. An examination of the evidence reveals nothing to support an inference of racial discrimination in Burns' handling of the Burgdorf memo. To the contrary, Burns' actions in this case were clearly more than reasonable.

For the foregoing reasons, the court will enter judgment for the defendant. An appropriate Order shall this day issue.