**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARY DALE ELLIS,
Plaintiff-Appellant,

v.

No. 98-2481

DIRECTOR, CENTRAL INTELLIGENCE
AGENCY,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-98-1058-A)

Argued: June 11, 1999

Decided: September 10, 1999

Before MURNAGHAN and TRAXLER, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Joel Paul Bennett, LAW OFFICES OF JOEL P. BEN-
NETT, P.C., Washington, D.C., for Appellant. Richard Parker, Assis-
tant United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Helen
F. Fahey, United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Mary Dale Ellis ("Ellis") brought this action against the Director of the Central Intelligence Agency (the "Agency") asserting various claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to 2000e-17 (West 1994). Although the complaint lacked clarity, the district court interpreted it as asserting claims for quid pro quo sexual harassment, hostile work environment sexual harassment, retaliation, and sex discrimination in the form of disparate treatment.[1] The district court granted summary judgment in favor of the Agency on all claims. Ellis appeals. Finding no error, we affirm.

I.

Ellis was hired by the Agency in 1966 as a GS-5 level Secretary. She was immediately converted to an Analyst, and was subsequently selected for the career training program. After a short stint in the Directorate of Administration, Office of Medical Services ("OMS"), Ellis was placed on rotational assignment with the Counterterrorist Center ("CTC"). Although the CTC was responsible for determining Ellis' job duties, she technically remained an employee of OMS, which continued to pay her salary.

While assigned to the CTC, Ellis achieved the rank of GS-15 and served as Chief of the Behavioral Sciences Branch, commonly referred to as the hostage negotiation unit. Two hostage negotiation courses taught by Ellis comprised the primary function of the Behavioral Sciences Branch, and were essential to achieving the Agency's then-existing counterterrorist goals. However, the CTC Management

_____

[1] Having found quite a few pages in the joint appendix out of sequence and jumbled, we sympathize with the district court's difficulty in identifying the issues for resolution from the documents filed by Ellis.

2

Council, in light of limited resources and the diminishing demand for the hostage negotiation courses, later established new priorities for the Agency's counterterrorist effort and decided to eliminate several of its units. Ultimately, Ellis was informed that the hostage negotiation unit would be abolished as of January 31, 1994.

When the hostage negotiation unit was closed, Ellis returned to OMS, where she was informed that she would continue to be paid her salary for one year, during which time she would have no responsibility other than to find a new job either within the Agency or otherwise. Ellis, however, exerted minimal effort to obtain a new position. She spoke with only a few other unit leaders regarding potential job openings and neglected even to send out a resume. After the Agency's efforts to find Ellis a position within its various branches proved unfruitful, Lester B., the Director of OMS, recommended that Ellis be declared "excess" to the needs of the Agency. A declaration to that effect was eventually made, but Ellis opted to take discontinued service retirement in lieu of termination.

Following her retirement, Ellis submitted the second of two charges to the Equal Employment Opportunity Commission (hereinafter "EEOC" or "Commission"), alleging sex-related misconduct at the Agency. In the first EEOC charge, which has only tangential relevance to the present appeal, Ellis alleged that she was subjected to sex discrimination and retaliation at the Agency between 1988 and 1989. The second EEOC charge, which led to this action, alleged sexual harassment, retaliation, and sex discrimination at the Agency between 1993 and 1994.[2]

Notably, it was in the second EEOC charge that Ellis first voiced claims of sexual harassment and retaliation against Robert B. -- a

_____

[2] Actually, Ellis filed a total of three charges with the EEOC. The latter two charges, EEOC Nos. 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X and 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X, were consolidated by the EEOC and are collectively referred to as Ellis' "second EEOC charge." The first EEOC charge filed by Ellis, EEOC No. 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X, originated in a 1988 grievance which Ellis initiated at the Agency. Ellis contends that the acts of retaliation alleged in her second EEOC charge, and in this action, were prompted by this first EEOC charge.

3

married co-worker and former supervisor with whom Ellis had had a lengthy and clandestine sexual relationship. Specifically, Ellis alleged that Robert B. sat on the panel evaluating her performance in 1993, and that in response to her rejection of his unwelcome sexual advances, he influenced the panel to give Ellis a poor performance rating. According to the evidence presented, Ellis indeed ranked last among the Agency's GS-15 employees in 1993. However, prior rankings that Ellis had received since joining the CTC in 1988 were equally critical of her performance. Ellis also alleged that Robert B. retaliated against her refusal to continue their sexual relationship by reducing her job opportunities and responsibilities, denying her request for continued language training, and denying her request to attend a disaster management conference.

In addition to the allegations concerning Robert B., Ellis alleged in her second EEOC charge that the Agency fostered a hostile work environment toward women. Ellis also asserted that the Agency retaliated against her for filing her first EEOC charge by failing to provide a reviewing official for her 1993 evaluation (in which Robert B. participated), by dismantling the hostage negotiation unit, and by declaring her "excess" to the employment needs of the Agency.

The Agency conducted an independent investigation of the charges filed by Ellis. Meanwhile, Ellis made a timely request for an administrative hearing and after a series of prehearing conferences, an Administrative Law Judge held a three-day hearing on the charges. Based on the record, which consisted of reports of investigation, the hearing transcript, and the exhibits entered into evidence at the hearing, the Administrative Law Judge found that Ellis was neither subjected to sex discrimination nor the victim of sexual harassment or retaliation.

Thereafter, Ellis filed a complaint in the district court alleging the same misconduct underlying her second EEOC charge. Although finding Ellis' complaint to be defective for lack of specificity, the district court surmised that Ellis was attempting to present Title VII claims for quid pro quo sexual harassment, hostile work environment sexual harassment, retaliation, and sex discrimination. Following a hearing, the district court entered summary judgment in favor of the

Agency upon finding that each of Ellis' claims failed as a matter of law. Ellis now appeals.

## II.

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C.A. § 2000e-2(a)(1) (West 1994). We address Ellis' quid pro quo sexual harassment, hostile work environment sexual harassment, and retaliation claims seriatim.[3]

## A.

We first address Ellis' claim of sexual harassment under the quid pro quo theory. Specifically, Ellis alleges that because she was unwilling to assent to the unwelcome sexual advances of Robert B., a superior with influence over the terms, conditions and/or privileges of Ellis' employment, he persuaded the Agency to discharge her.

In order to establish a claim for quid pro quo sexual harassment, an employee must establish that she was subjected to unwelcome sexual harassment based upon sex and that the "employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment." Spencer v. General Elec. Co., 894 F.2d 651, 658 (4th Cir. 1990), overruled on other grounds, 506 U.S. 103 (1992). "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." Burlington Indus., Inc. v. Ellerth, 118 S.Ct. 2257, 2265 (1998).

_____

[3] Before the district court, Ellis alleged generally that the Agency treated women less favorably than men. Our review of the record, however, reveals utterly no evidence of disparate treatment amounting to sex discrimination. Therefore, to the extent Ellis attempts to assert a disparate treatment claim, we affirm the district court's dismissal of it without further discussion.

Even were we to assume that Ellis could show that she was subjected to "unwelcome" sexual advances by Robert B.,**4** her quid pro quo sexual harassment claim fails because Ellis has not established that her "reaction to the [advances] affected tangible aspects of [her] compensation, terms, conditions, or privileges of employment." Spencer, 894 F.2d at 658; see also Ellerth , 118 S. Ct. at 2268 (defining "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). According to Ellis, she was declared "excess" and ultimately displaced because Robert B., frustrated with Ellis' denial of his sexual advances, convinced the career panel reviewing Ellis' performance to rank her unreasonably low in 1993. However, the record simply does not support the assertion that Ellis' displacement was related to her previous evaluation (or evaluations), much less to her denial of Robert B.'s sexual advances.

On the contrary, the record reveals that Robert B. had no role in the decision to declare Ellis "excess," which ultimately resulted in her displacement. Instead, this decision was made by Lester B. who did not learn of the affair between Ellis and Robert B. until December 1994, after Ellis' departure.**5** Furthermore, while Ellis now complains

_____

**4** In this regard, we note that although Ellis presented sufficient evidence to establish a long-term sexual relationship with Robert B., she has neither alleged nor proven any specific incidents of sexual conduct which were involuntary or "unwelcome." See Spencer, 894 F.2d at 658; see also Meritor Sav. Bank v. Vinson, 477 U.S. 57, 68 (1986) ("The gravamen of any sexual harassment claim is that the alleged sexual advances were `unwelcome.'"). According to the evidence presented, Ellis and Robert B. began their consensual sexual relationship in 1973. At the EEOC hearing, Ellis testified that although she attempted to end the relationship on several occasions, it lasted for 18 years, through the date that she left the Agency. Additionally, while the record reveals that Ellis had previously filed sexual harassment claims against the Agency, she made no mention of any "unwelcome" sexual advances committed by Robert B. either at the time she filed her first EEOC charge or at any time during their relationship.

**5** We note that, once informed of the sexual relationship between Robert B. and Ellis, Lester B. disciplined Robert B. for his indiscretion. Specifically, Robert B. was demoted, permanently barred from serving as a manager, prohibited from receiving awards, and required to forfeit his entitlement to a more lucrative retirement plan.

6

of Robert B.'s participation on the 1993 career panel, prior to her departure Ellis never objected to Robert B. serving as her supervisor or on the 1993 career panel. In any event, Ellis had a longstanding history of poor performance that far preceded Robert B.'s 1993 panel participation. Indeed, the Agency had ranked Ellis nearly last among approximately 20 officers every year since Ellis joined the CTC in 1988. Her performance rating in 1993 -- ranking her 21 out of 21 officers -- was entirely consistent with those from prior years. Ellis, prior to Robert B.'s participation on the 1993 career panel, established a dismal performance record rendering her position with the Agency infirm rather than stable.

In sum, there is no indication that any of the compensation, terms, conditions, or privileges of Ellis' employment were conditioned upon the maintenance of a sexual relationship with Robert B. or that the cessation of that relationship influenced the events at issue or led to Ellis' early retirement. Therefore, the district court properly granted summary judgment for the Agency on Ellis' quid pro quo sexual harassment claim.

B.

We next address Ellis' claim for retaliation. In order to establish a prima facie case of retaliation, Ellis must prove "that she engaged in a protected activity, that she suffered an adverse employment action, and that the two were causally related." Glover v. South Carolina Law Enforcement Div., 170 F.3d 411, 413 (4th Cir. 1999), petition for cert. filed, ___ U.S.L.W. ___ (U.S. July 21, 1999) (No. 99-145). According to Ellis, she was the victim of unlawful retaliation in two primary respects during the course of her former employment with the Agency. First, Ellis contends that because she rejected Robert B.'s sexual advances, he retaliated against her by lowering her performance appraisals, denying her employment privileges, and undermining her professional credentials. Second, Ellis contends that the Agency, in response to her first EEOC discrimination charge, retaliated against her by denying her a "reviewing official" during her 1993 performance evaluation, by dismantling her unit, and ultimately by declaring her "excess" and subject to displacement.

As a preliminary matter, we note that Ellis' charge of retaliation against Robert B. does not encompass the type of "ultimate employ-

7

ment decisions" which, generally speaking, are actionable as retaliation under 42 U.S.C.A. § 2000e-2(a)(1):

> Title VII, most notably . . . 42 U.S.C. § 2000e-2(a)(1), has consistently focused on the question whether there has been discrimination in what could be characterized as <u>ultimate employment decisions</u> such as hiring, granting leave, discharging, promoting, and compensating.
>
> . . . .
>
> . . . Among the myriad of decisions constantly being taken at all levels and with all degrees of significance in the general employment contexts covered by Title VII . . ., it is obvious to us that there are many <u>interlocutory or mediate decisions</u> having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions of . . . Title VII.

<u>Page v. Bolger</u>, 645 F.2d 227, 233 (4th Cir. 1981) (emphasis added). More precisely, Ellis' retaliation claim alleging that Robert B. excluded her from deployments, language training, and attendance at a disaster management conference fails because such allegations concern no more than "interlocutory or mediate decisions" which are not actionable under Title VII. <u>See Page</u>, 645 F.2d at 233.

We reach a similar conclusion with respect to Ellis' claim that the Agency retaliated against her by refusing to provide a reviewing official for her 1993 performance evaluation.[6] Ellis contends that the Agency's refusal in this regard was contrary to its normal practice and that there was a negative stigma to the absence of such a review. However, even if we were to accept Ellis' contentions regarding common Agency practice as true, the absence of a reviewing official also makes reference to no more than an "interlocutory or mediate decision," which is not actionable as retaliation. <u>Id.</u>

_____

[6] Apparently, Ellis believed that a reviewing official would have increased the integrity of the evaluation process by serving as a check on Robert B.'s authority.

8

Thus, Ellis is left to pursue her allegation that the Agency's decisions to abolish her unit and declare her "excess" were ultimate employment decisions made as a direct result of her engaging in the protected activity of filing her initial EEOC charge against the Agency. We agree that Ellis engaged in "protected activity" when she filed her first EEOC charge against the Agency, and we assume that the Agency's decisions to abolish her unit and declare her "excess" were ultimate employment decisions.[7] Nevertheless, we believe that the Agency was entitled to summary judgment because Ellis failed to show a causal connection between the filing of her EEOC charge and any adverse action taken by the Agency.

The record in this case, considered in the light most favorable to Ellis, reveals that the hostage negotiation unit was eliminated because of the Agency's decision that a number of programs "should be reduced or eliminated to reflect new priorities, and diminishing demand and resource constraints." Having experienced nine months of near inactivity immediately prior to being abolished, the hostage negotiation unit was a prime target to be cut by the Agency. Ultimately, the Agency determined that the budget established for counterterrorist activities was better spent on contemporary threats such as "bombs, [and] things that are more relevant today than they were back in the `80s, when hostage negotiation, or [Ellis'] specialty, was perhaps a larger issue."

In the absence of any evidence suggesting that retaliation was the motive underlying the abolishment of the entire hostage negotiation unit, we decline to second-guess a strategic decision made by the

_____

[7] We acknowledge this court's decision in Hopkins v. Baltimore Gas & Electric, 77 F.3d 745 (4th Cir. 1996), in which we held that the dismantling of a work unit was not an "adverse employment action," i.e., not an "ultimate employment decision," because, inter alia, the complaining employee could have continued his employment with the same employer in another capacity. Id. at 754-55. Here, it is not clear from the evidence that Ellis, considering the reduced demand for her skills, could have obtained employment at the Agency after the dismantling of the hostage negotiation unit. We thus assume, without deciding, that in the present context, the unit dismantling constituted an ultimate employment decision.

9

Agency. Our ruling is compelled by the axiom that"[t]he crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not . . . its business judgment." Jiminez v. Mary Washington College, 57 F.3d 369, 383 (4th Cir. 1995). Furthermore, we are guided by the principle that "[c]ourts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 578 (1978).

Not surprisingly, in a final effort to salvage her retaliation claim, Ellis maintains that even if the hostage negotiation unit was abolished for legitimate reasons, the Agency nonetheless retaliated against her by declaring her "excess" rather than finding her another position within its remaining units. In other words, Ellis alleges that the Agency, in retaliation for the filing of her first EEOC charge, failed to exert its best efforts to seek employment for her once the hostage negotiation unit became defunct. The Agency, of course, had no duty to exert its best efforts to find Ellis alternative employment. We do note, however, that the Agency expended significant effort on her behalf. In stark contrast to the minimal effort that Ellis made on her own, the Agency's attempt to garner Ellis employment by circulating Ellis' personnel file throughout its active departments was commendable.

Although it was ultimately the decision of the Agency that Ellis was not qualified for any position remaining after the dismantling of the hostage negotiation unit, Ellis presented no evidence that she was treated differently from other Agency employees who were declared "excess" after unit abolishment. Indeed, in the case of such a downsizing, Title VII does not immunize employees from displacement despite their lack of qualifications, but merely precludes employers from retaliating against them for engaging in protected activity.

In sum, the record reveals unquestionably that the Agency did not retaliate against Ellis either when it abolished the hostage negotiation unit or when it subsequently declared her "excess" to the Agency's needs. Simply stated, the hostage negotiation unit no longer enjoyed a level of usefulness sufficient to justify its mission. As Ellis was qualified only in the area of hostage negotiation, her departure from the Agency reasonably followed from the unit's dismantling. Thus,

10

the district court properly ruled that Ellis failed to establish a prima facie case of retaliation against the Agency.

C.

We next address Ellis' contention that she was subjected to a hostile work environment at the Agency. Sexual harassment which creates a hostile work environment is actionable under Title VII because it amounts to discrimination in the conditions of employment. See Meritor, 477 U.S. at 63-68. Distinguished from quid pro quo sexual harassment, hostile work environment sexual harassment focuses on general improprieties such as "unfulfilled threats." Ellerth, 118 S. Ct. at 2265; see also Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2283 (1998) (prohibition against hostile work environment "is not limited to economic or tangible discrimination .. . and . . . covers more than terms and conditions in the narrow contractual sense.") (citation and internal quotation marks omitted). However, to state an actionable hostile work environment claim, the sexual harassment must be "sufficiently severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment." Meritor, 477 U.S. at 67 (internal quotation marks omitted).

In support of her hostile work environment claim, Ellis presents no more than scant references to behavior allegedly undertaken by various employees of the Agency. For instance, Ellis complains that she once viewed a swimsuit calendar prominently displayed in a male co-worker's office. On another occasion, Ellis claims to have overheard a male employee refer to a female co-worker as "terrible, incompetent, the worst person [he had] ever seen." According to Ellis, the male employee commented further that the female co-worker was not deserving of a promotion.

Ellis' allegations, assuming they are true, are simply insufficient to satisfy the requirement that the harassment be so severe or pervasive as to create an abusive working environment. "Title VII does not provide a remedy for every instance of verbal or physical harassment in the workplace," Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 183 (4th Cir. 1998), nor is it "a federal guarantee of refinement or sophistication in the workplace," Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997). Rather, Title VII "prohibits only

11

harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." Id.; see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (holding that the environment must be objectively hostile or abusive, i.e.,"an environment that a reasonable person would find hostile or abusive"). Obviously, Ellis has not alleged any conduct rising to the level of an objectively hostile or abusive work environment. Under the circumstances, "allowing [Ellis'] claim to go to trial would countenance a federal cause of action for mere unpleasantness." Hartsell, 123 F.3d at 773. Thus, the district court properly granted judgment as a matter of law on Ellis' hostile work environment claim.

III.

For the foregoing reasons, we affirm the district court's decision granting summary judgment to the Agency as to all claims.**8**

AFFIRMED

_____

**8** On appeal, Ellis has also raised two procedural issues, contending that the district court erred in not allowing her to amend her complaint and in not allowing her new counsel to conduct additional discovery. Having reviewed Ellis' contentions in this regard, we find these additional grounds for appeal to be without merit.