106 F.3d 401
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Cathy Ann PERKOVICH, Plaintiff-Appellant,
v.
ROADWAY EXPRESS, INC., Ron Andras and David Gamble,
Defendants-Appellees.
 No. 95-4276.
 United States Court of Appeals, Sixth Circuit.
 Jan. 22, 1997.
 
 Before: GUY, RYAN, and COLE, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff Cathy Ann Perkovich filed suit against her former employer, Roadway Express, Inc., as well as her supervisors, Ron Andras and David Gamble, alleging quid pro quo sexual harassment in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), retaliatory discharge in violation of 42 U.S.C. § 2000e-3, and intentional infliction of emotional distress in violation of Ohio common law. The district court granted summary judgment for the defendants and now, on appeal, Perkovich claims the district court erred. For the reasons that follow we will affirm.
 
 I.
 
 2
 In July 1991, Roadway Express appointed Perkovich to the position of Pricing Coordinator; she had been employed at Roadway Express since 1984. As Pricing Coordinator, Perkovich's immediate supervisor was Defendant Ron Andras. Andras reported to Defendant David Gamble. Gamble reported to the Director of Pricing, Christina Lauria, who in turn reported to Vice President Tony Poat.
 
 
 3
 Before receiving the position of Pricing Coordinator, Perkovich had held positions of Internal Auditor (1984-1987), and Supervisor of Credit (1987-1991). During her tenure with Roadway Perkovich attended graduate school at Baldwin-Wallace College and received her MBA in 1991. Roadway reimbursed her for part of her tuition.
 
 
 4
 In the position of Pricing Coordinator, Perkovich was initially assigned to process end-of-period financial information in a report entitled the "Freight Bill Model." She was also assigned secondary projects in inventory control and sales analysis (the "Sales Code Project"). In 1991, Perkovich had one performance review in the position of Pricing Coordinator. That review was given by Andras and is not the subject of this action.
 
 
 5
 In 1992, in addition to the "Freight Bill Model," Perkovich was assigned to work on two other projects, each with implications affecting this case. The first, called Statistical Process Control (SPC) required that Perkovich, under the direction of Lauria and Poat, develop a statistical analysis process. The second was a complex project called the CIC to which Perkovich was assigned on May 6, 1992. The CIC was a project to redesign the customer invoicing process, and Perkovich's job was to design and implement the invoicing. For the purposes of this project, Perkovich reported to Gamble.
 
 
 6
 In August 1992, Kelly Baumer replaced Gamble as the head of the CIC project. Perkovich confirmed her own commitment to the CIC project to Baumer in early August 1992. During a CIC meeting on September 3, 1992, Perkovich testified that she was given additional responsibilities for training the SPC auditors in connection with the CIC project. This was an unsatisfactory development for Perkovich and brought to a head other problems she felt were occurring within the CIC project, including in-fighting and other general nastiness.
 
 
 7
 On September 4, 1992, Perkovich notified Baumer that she was quitting the CIC project, and a few days later she announced in a CIC progress meeting she would no longer be working on the project.
 
 
 8
 At Perkovich's performance review on September 30, 1992, Andras raised concerns about Perkovich's unwillingness to take on new projects and her behavior on the CIC project. Andras rated her "below standard" on the "special projects" portion of her review. Perkovich became upset with her rating and, according to Andras, she began shouting and yelling. Perkovich claims she was merely angry and speaking in a raised tone of voice.
 
 
 9
 It was at this point, according to Perkovich, that Andras's demeanor changed. She claims
 
 
 10
 [H]e leaned forward towards me and, in a very nice, pleasant tone of voice, began asking me what he could do to help me.
 
 
 11
 Q Were you offended by that?
 
 A I was confused by that
 
 12
 He began telling me that he could help fix this [negative] mark. And he began asking over and over again what was it--what was it that I wanted him to do to fix this, or how could he help me?
 
 
 13
 Q And what did you say?
 
 
 14
 A Well, at that point it was apparent to me, from his tone of voice and from him leaning forward towards me, that we were no longer having a business discussion, we were having a personal discussion.
 
 
 15
 Q What was it that he said that made it personal?
 
 
 16
 A It was the tone of his voice. It was that he could fix this problem for me; fix this job standard for me....
 
 
 17
 ....
 
 
 18
 So, I said to him "You can re"--I pointed to the standard. I said "You can re-evaluate this job standard based on the facts," at which point he was furious. And he said "No. You're unwilling to freely share yourself," at which point my mouth dropped open.
 
 
 19
 He was saying to me that if I was willing to be friendly to him sexually, that he'd be willing to fix my job standard.
 
 
 20
 Q Is that what he said to you? Did he say "If you are friendly with me sexually, I will fix your job standard"?
 
 
 21
 A Not in those words.
 
 
 22
 Two days later, Andras gave Perkovich a copy of her review to sign. His written evaluation explained why he had rated her a "negative" on "special projects":
 
 
 23
 A greater willingness on Cathy's part to accept new assignments and share the expertise she has acquired through her formal education and experience is recommended. The nature of Coordinator is to freely share ones [sic] expertise in whatever area or manner the company deems best. Cathy's knowledge is a valuable asset and the company desires to utilize it fully.
 
 
 24
 Perkovich signed the review form and did not add any comments in the space reserved for employee comments
 
 
 25
 In early October, Andras stopped by Perkovich's office and asked whether she would attend an office pizza party that was currently underway:
 
 
 26
 Q And your supervisor [Andras] suggested that you go to the party too?
 
 
 27
 A No, he didn't suggest. He came in and asked "Are you going to the pizza party?" And he stood in my doorway. It was lunchtime, like that.
 
 
 28
 Q He said "Are you going to the pizza party?," and you said "No"?
 
 
 29
 A Right.
 
 
 30
 Q And what did he say?
 
 
 31
 A "Are you sure?"
 
 
 32
 And I said "Yeah." And he walked on. And I went home for lunch that day.
 
 
 33
 ....
 
 
 34
 I think--I think he was testing the waters to see it I would be friendly to him and go to the pizza party with him.
 
 
 35
 Q And you thought that had a sexual connotation?
 
 A Yes
 
 36
 Later that day Perkovich was called into Gamble's office for an interim follow-up meeting with Andras on Perkovich's performance appraisal. Gamble told her he agreed with Andras that Perkovich had left the CIC project in an inappropriate manner. Perkovich did not say anything at that time about her belief regarding the inappropriateness of Andras's behavior.
 
 
 37
 On May 10, 1993, Andras informed Perkovich that a performance review was scheduled for May 13, 1993 and that Gamble would be present. Perkovich responded that if Gamble were present the meeting would have to be rescheduled because she intended to have her attorney present. She also alleged for the first time that she had received "bias, abusive" treatment from "Pricing Management." She was advised that she could not bring her attorney to the meeting and that the review would be rescheduled. Andras also advised Perkovich, in two separate memos, that if she felt she had been abused, harassed, or discriminated against, she should pursue her charge through the company's internal complaint system. Attached to one of the memos was the company president's Equal Opportunity Policy.
 
 
 38
 On May 18, 1993, Perkovich filed an internal complaint alleging sexual harassment by posting a letter to the company's general counsel. Both Andras and Gamble testified that they were unaware of Perkovich's internal complaint when she was terminated on May 27, 1993.
 
 
 39
 On May 20, 1993, Perkovich came to her performance review with a tape recorder. The meeting was adjourned to determine whether recording devices were permitted during performance evaluations. Perkovich was later advised that while tape recorders were not permitted, she was encouraged to take notes. Although the review was rescheduled for the next day, Perkovich called in sick. However, she informed Andras that she still intended to record her review. Andras responded by memorandum stating that any such continued insubordination would subject her to discharge. Perkovich showed up at her rescheduled performance appraisal with a tape recorder and was subsequently terminated.
 
 
 40
 Perkovich filed a complaint with the EEOC and the Ohio Civil Rights Commission (OCRC) on June 9, 1993, alleging sexual harassment and retaliatory discharge. Neither the EEOC nor the OCRC found any evidence of discrimination. Perkovich then filed this action.
 
 
 41
 The district court granted Roadway Express's Fed.R.Civ.P. 56 motion for summary judgment on the quid pro quo sexual harassment claim holding that "[t]he evidence is so one-sided that it does not require submission to a jury and the defendants must prevail as a matter of law." The court also held that Perkovich could not prove a causal connection between the filing of her internal complaint and her termination, and therefore, dismissed her retaliatory discharge claim. Perkovich now appeals.
 
 II.
 
 42
 Perkovich first claims the district court erred in holding that she had not established a prima facie case of quid pro quo sexual harassment. Specifically she asserts that although the district court may have "correctly concluded that the most reasonable inference to be drawn" from the evidence was that no harassment had taken place, a reasonable jury "could draw a contrary inference from the same evidence."
 
 
 43
 In Kauffman v. Allied Signal, Inc. 970 F.2d 178 (6th Cir.1992), this court identified five elements that must be proved to sustain a claim of quid pro quo sexual harassment:
 
 
 44
 The employee was a member of a protected class;
 
 
 45
 2. The employee was subject to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors;
 
 
 46
 3. The harassment complained of was based on sex;
 
 
 47
 4. The employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and,
 
 
 48
 The existence of respondent superior liability.
 
 
 49
 Id. at 186. Further, the Supreme Court has held that for sexual harassment to be actionable under Title VII, the alleged harassment must be sexually offensive to a reasonable person. Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993).
 
 
 50
 As to the plaintiff's sexual harassment claim, the district court stated:
 
 
 51
 A step by step analysis of each of the factors required for quid pro quo sexual harassment is not necessary because the evidence simply does not amount to sexual harassment. To reach such a conclusion requires a good deal of speculation and imagination. An assessment of the evidence reveals that summary judgment should be granted on this issue. The evidence is so one-sided that it does not require submission to a jury and the defendants must prevail as a matter of law.
 
 
 52
 This court's review of a grant of summary judgment is de novo. Brooks v. American Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991).
 
 
 53
 Perkovich testified that Andras never touched her, never suggested that she go to bed with him, and never told her that if she had sex with him he would change her evaluation. Perkovich stated that Andras's comments that she was "unwilling to share herself" were made after their discussion regarding Perkovich's unwillingness to train people on the CIC project. Perkovich interprets Andras's comments as sexually suggestive. She bases that interpretation on his "change of tone" during her performance review, and on the words he used in her written evaluation. A letter Perkovich wrote to the Ohio Civil Rights Commission provides valuable insight into Perkovich's reasoning:
 
 
 54
 People communicate their attitudes and motivations to us by the choices they make. We can probably tell, for example, from the clothing, the hairstyle, and the friends a man chooses whether he is, say, a banker or a motorcycle biker. His choices suggest his profession and personality, and reveal something of his persuasion: one loves money, the other loves Harleys. Because writing is just another form of communication, the writer too reveals information about his own identity. The words he chooses are the outward expression of his inner motivation.
 
 
 55
 Notice the words Ron chose in my performance appraisal: "willingness," "share," "freely share," "knowledge," "desires," and "desired." ... The dictionary provides one definition of "knowledge" as sexual intercourse. The word "desire" is defined as sexual appetite or passion. Obviously these words can have definitions which are not sexual. And any one of these words appearing by itself would probably not cause the reader to question its meaning. But Ron packed six words into four sentences! What are the odds that six words, all with sexual connotations, found their way to the same spot on the page by chance? These words are not scattered about. The juxtaposition or grouping of these words is deliberate. They appear one after the other in short succession, striking the reader like a hammer and driving the point home. In Ron's view, I am a sexual object.
 
 
 56
 We think the district court put it mildly in declaring that the plaintiff's theory, that the language she attributes to Andras is evidence of sexual harassment, "requires a good deal of speculation and imagination." We would put it a bit more directly: Perkovich has completely failed to establish a prima facie case of sexual harassment. Her case is utterly devoid of even the slightest hint of evidence of sexual harassment. It is an injustice of the most serious sort that the defendants and particularly Andras and Gamble, should have been made to suffer the indignity and perhaps the scandal of the plaintiff's groundless accusation.
 
 
 57
 We affirm the district court's summary judgment for defendants.
 
 III.
 
 58
 Perkovich next argues that the temporal proximity of her internal complaint and subsequent termination show a causal connection that supports her claim for retaliatory discharge in violation of 42 U.S.C. § 2000e-3. Additionally, Perkovich claims that her excellent work record, coupled with Roadway Express's lack of internal policy regarding the taping of performance reviews, militates against the harsh disciplinary action for her insubordination.
 
 
 59
 The district court held that Perkovich had not established a jury submissible issue showing a causal connection between her complaint and her discharge. In that finding, we think the district court erred.
 
 
 60
 Retaliatory discharge is governed by 42 U.S.C. § 2000e-3. That section states in pertinent part
 
 
 61
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 
 
 62
 42 U.S.C. § 2000e-3(a). Retaliatory discharge may be shown either by direct or circumstantial evidence.
 
 
 63
 The Supreme Court announced the order, allocation, and standards of proof for discrimination cases based on circumstantial evidence under Title VII in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In this circuit, the so-called McDonnell Douglas paradigm has been held to apply to retaliatory discharge cases. Johnson v. Department of Health & Human Services, 30 F.3d 45, 47 (6th Cir.1994).
 
 
 64
 We have held that retaliatory discharge may be demonstrated by proving:
 
 
 65
 1. That the claimant was engaged in activity protected under Title VII;
 
 
 66
 2. That the claimant was the subject of an adverse employment action; and
 
 
 67
 3. That there is a causal link between the protected activity and the adverse employment action.
 
 
 68
 Id. The Supreme Court has held that "there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption,' " O'Connor v. Consolidated Coin Caterers Corp., 116 S.Ct. 1307, 1310 (1996) (citation omitted). In Zanders v. National Railroad Passenger Corp., 898 F.2d 1127 (6th Cir.1990), this court held that the claimant must offer evidence " 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.' " Id. at 1135 (citation omitted).
 
 
 69
 Once the plaintiff establishes a prima facie case, the burden of production shifts the defendant to produce "evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (internal quotation marks and citation omitted). The Supreme Court, in an often misunderstood passage, held that when the defendant carries this burden, " 'the presumption raised by the prima facie case is rebutted, ... and drops from the case.' " Id. (citation omitted). In reality, the evidence that comprised the prima facie case is still "in the case" and may be relied upon by the trier of fact. Instead, the force of presumption is what "drops from the case."
 
 
 70
 The plaintiff may then present her case to the fact finder if the plaintiff proves that the presented nondiscriminatory reason was only pretextual. Id. at 508. The plaintiff may accomplish this by showing:
 
 
 71
 "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her termination], or (3) that the [proffered reasons] were insufficient to motivate [her termination]."
 
 
 72
 Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir.1994) (emphasis and citation omitted). The plaintiff retains " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " St. Mary's Honor Ctr., 509 U.S. at 518 (citation omitted).
 
 
 73
 Here, the district court held that "Perkovich has failed to raise an inference that her discharge was causally related to her complaints of harassment," and was thus barred from asserting retaliatory discharge. Specifically, the court held that Perkovich was dismissed for insubordination and not in retaliation for the filing of an internal complaint.
 
 
 74
 To the extent Perkovich has shown a duration of just seven days between the time she filed her complaint and the time of her discharge, we think she has raised an inference of causation and the district court's contrary conclusion is error. However, even assuming Perkovich has met her burden of establishing a prima facie case of retaliation, summary judgment is nevertheless appropriate because she has failed to show that the asserted nondiscriminatory reason by the defendant for terminating Perkovich was merely pretextual. See St. Mary's Honor Ctr., 509 U.S. at 508.
 
 
 75
 Roadway Express's stated reason for discharging Perkovich is that she was guilty of insubordination in bringing a tape recorder to her performance review after having been warned that she was subject to dismissal if she did so. Viewing the evidence in the light most favorable to Perkovich, she has failed to offer any evidence that she was not terminated for attempting to tape-record her performance review after having been requested not to bring the recorder to her review, and being warned that if she did so she would be fired. Perkovich has not shown, for example, "that others were not terminated for violations of the tape recording policy or comparable instances of insubordination," or offered any other evidence creating a jury submissible issue that the reason for her discharge was other than the one offered by Roadway Express. The district court was correct in granting summary judgment in this case. We find Perkovich's claims to be meritless.
 
 IV.
 
 76
 This is an example of an egregious misuse of the remedies afforded under the Civil Rights Act. The record demonstrates the defendants were forced to litigate an indisputably meritless claim. Two men, Ron Andras and David Gamble, were required to suffer what very likely were widely publicized allegations of sexual misconduct, and to endure the burden and embarrassment of litigating this case. Notwithstanding our disposition of this appeal, these men will very likely carry with them for a long time the taint of the plaintiff's baseless accusations.
 
 
 77
 We find this appeal to be frivolous. Fed.R.App.P. 38.
 
 
 78
 The parties are notified that we are considering the imposition of appellate sanctions. See Roadway Express, Inc. v. Piper, 447 U.S. 752, 767 (1980). All parties and their counsel shall have 14 days hereafter within which to file with the Clerk of the Court such affidavits and other material they deem relevant to the matter of appropriate sanctions.
 
 
 79
 The judgment for defendants is AFFIRMED.