**James Randall PETERSON, Plaintiff,**

v.

**Togo D. WEST, Secretary of Veterans Affairs, Defendant.**

**No. Civ. 1:99CV165.**

United States District Court, W.D. North Carolina, Asheville Division.

Oct. 27, 2000.

650

Geraldine Sumter, Ferguson, Stein, Wallas, Gresham & Sumter, P.A., Charlotte, NC, for James Randall Peterson, plaintiff.

Richard Lee Edwards, United States Attorney, Asheville, NC, for Togo D. West, Jr., Sec DVA, defendant.

## *MEMORANDUM AND ORDER*

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendant's motion for summary judgment[1] which is opposed by the Plaintiff. For the reasons stated herein, the undersigned dismisses the action.

### I. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the Defendant as the moving party has the initial burden to show a

---

1. Defendant's motion is captioned as one for summary judgment. Defendant's memorandum in support thereof is captioned as one for dismissal or in the alternative as for summary judgment. The Court has treated the motion as one for summary judgment.

lack of evidence to support Plaintiff's case. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. FINDINGS OF FACT CONCERNING THE STATUTE OF LIMITATIONS

The parties do not dispute that the final agency action taken in connection with the Plaintiff's allegations of discrimination was the Final Agency Decision issued by the Department of Veterans Affairs, Office of Employment Discrimination Complaint Adjudication on May 10, 1999. Exhibit J, *attached to* the Defendant's Motion for Summary Judgment. Nor is it disputed that the Decision notified Plaintiff of his right to appeal to the Equal Employment Opportunity Commission (EEOC) within 30 days and provided the following information:

A civil action may also be filed in an appropriate United States District Court. A civil action may be filed [ ] within 90 days of receipt of this final decision *if no appeal to EEOC has been filed*....

[T]he civil action *MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS* of the date of receipt of this final agency decision....

*Id.*

There is no indication in the record of the date on which Plaintiff received this "right to sue" letter. In the complaint, Plaintiff alleges only that he "filed this action within ninety (90) days of receipt of the final administrative decision and has thereby complied with all jurisdictional requirements by exhausting the necessary administrative prerequisites before initiating this proceeding." Complaint, at 4. However, it is clear that Plaintiff did not appeal to the EEOC and this civil action was filed on August 12, 1999.

## III. DISCUSSION

The date on which the claimant received the EEOC letter becomes critical in determining the commencement of the 90–day period. In ascertaining the delivery date, we have rejected an "actual receipt" rule.... Of course, if the actual date of receipt is confirmed by evidence, that date governs. If the date is unknown, however, it is presumed that service by regular mail is received within three days pursuant to Rule 6(e) of the Federal Rules.

*Nguyen v. Inova Alexandria Hosp.,* 187 F.3d 630 (table), 1999 WL 556446 *3 (4th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1240, 146 L.Ed.2d 99 (2000) (citations omitted); *Williams v. Enterprise Leasing Co. of Norfolk/Richmond,* 911 F.Supp. 988, 991–92 (E.D.Va.1995). Applying the three day mailing provision of Rule 6(e), Plaintiff's complaint should have been filed on or before August 11, 1999. The action, therefore, was not timely filed.

However, the statute of limitations provided by 42 U.S.C. § 2000e–5(f)(1) is not jurisdictional. *Williams, supra.* Nonetheless, the Fourth Circuit has rarely found equitable tolling of the filing period to be appropriate, noting that such relief is only available where the defendant misled or deceived the plaintiff in order to prevent timely filing. *Nguyen, supra; Watts–Means v. Prince George's Family Crisis Ctr.,* 7 F.3d 40, 42 (4th Cir.1993); *Olson v. Mobil Oil Corp.,* 904 F.2d 198, 201 (4th Cir.1990); *Harvey v. City of New*

*Bern Police Dep't,* 813 F.2d 652, 654 (4th Cir.1987); *Harper v. Burgess,* 701 F.2d 29, 30 (4th Cir.1983). Here, it is obvious that the Plaintiff was well acquainted with grievance procedures, frequently referred to his equal employment rights and was prolific and accomplished in filing grievances. *See, e.g.,* Exhibit B, Exhibits to the Deposition of James Randall Peterson *attached to* Defendant's Motion, at Deposition Exhibits 8, 9, 10, 12; Exhibit K, *attached to* Defendant's Motion; Exhibit D, Excerpts from Peterson Deposition *attached to* Plaintiff's Memorandum in Opposition to Defendant's Motion, at Deposition Exhibits 7, 8, 9, 10, 12, 19. And, although he was represented by counsel, Plaintiff clearly knew how to protect his rights. This is not an occasion appropriate for equitable tolling. Indeed, in its most recent pronouncement on the issue, the Fourth Circuit quoted the Supreme Court.

> "Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of vague sympathy for particular litigants.... [I]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."

*Edelman v. Lynchburg College,* 228 F.3d 503, 511 (4th Cir.2000) (quoting *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984)). The undersigned therefore finds that the Plaintiff's complaint was not timely filed and there is no reason to apply equitable tolling. Because neither of the parties addressed this issue, the undersigned, in the interest of finality, will address the substantive claim since there is subject matter jurisdiction. *Williams,* 911 F.Supp. at 993.

## IV. FINDINGS OF FACT

Plaintiff's only claim is based on retaliatory treatment which altered the terms and conditions of his employment. Plaintiff's employment with the Defendant began in 1976. In 1993, Plaintiff applied for and received the position of full assistant chief of engineering in the Asheville facility. Exhibit D, *attached to* Plaintiff's Memorandum, at 100, 61. Although this was a lateral move, it provided additional supervisory experience and enabled Plaintiff's wife to be closer to her family. *Id.* When the Plaintiff reported for duty in Asheville, he learned that the Chief of Engineering had been placed on an extended sick leave. *Id.,* at 72–73. Within a month of beginning the job, Plaintiff was made the acting chief for a time period not to exceed 120 days. *Id.,* at 74. This temporary position increased his salary. *Id.*

Plaintiff interviewed for the position of Chief of Engineering but was not selected. *Id.,* at 95, 100. Plaintiff admitted that he was not the top candidate for the position despite the fact that he had been the acting chief. *Id.,* at 191. And, he was not upset about the selection of Carl Wagner for the position. *Id.,* at 103. However, as events unfolded, problems developed between the two men.

As early as February 1994, Plaintiff made clear to Wagner that he did not approve of his management style. When told to complete a task involving quality assurance by a certain deadline, Plaintiff e-mailed Wagner to ask for an extension due to his lack of experience in developing the plan solicited. Deposition Exhibit 2, *attached to* Defendant's Exhibit B. Wagner responded that it had been his own lack of experience which prompted him to assign the task to the Plaintiff. *Id.* In addition, Wagner stated that he "really want[ed] to start getting [Peterson] involved of the process of QA. I will ask for an extension and then maybe we can get together to work on it." *Id.* Plaintiff's response to that e-mail was, "pardon the term but 'dumping it on me' w/out direction and no resources is a poor training exercise." *Id.*

In March 1994, Plaintiff learned that Wagner's secretary had filed a grievance against Wagner alleging sexual harass-

ment based on an incident involving an inappropriate joke. Deposition of James Randall Peterson, at 121. When Plaintiff was interviewed by the resource officer concerning this matter, he secretly tape recorded the conversation because he was "scared" of the officer. *Id.*, at 122, 125. Plaintiff had concluded that Wagner, the associate director of the facility, and the resource officer had "a strong alliance." *Id.* Plaintiff believed anything he said in the meeting would be passed on to Wagner. *Id.*, at 123. And yet, during the interview with this officer, Plaintiff discussed the issue of retaliation against him by Wagner. *Id.*, at 124. Moreover, despite his concern about the interview, the fact was that the Plaintiff had not witnessed the alleged act of sexual harassment about which the secretary had complained; and, therefore, could be of no assistance to her. *Id.*, at 126. Moreover, many other employees were interviewed during the investigation of the grievance. *Id.*, at 126–27. And, Plaintiff had no independent information that Wagner ever learned what he said during the investigation. *Id.*, at 128.

In that same month, Plaintiff applied for a position in Hawaii which required Wagner to give him a recommendation. *Id.*, at 137–38. Wagner provided good ratings for the Plaintiff. *Id.*

In June 1994, Wagner began a reorganization of the engineering department. The reorganization had been made a part of his job description at the time he was hired and it involved a reduction in the number of supervisors at the facility. Exhibit 1, *attached to* Plaintiff's Deposition Transcript. The reorganization eliminated Plaintiff's position as the full assistant chief of engineering and instead implemented a program whereby each department had its own assistant chief. *Id.* Thus, whereas before, each supervisor reported to the Plaintiff who then reported to Wagner, now each department had a supervisor with hands on supervision. *Id.* Each of those supervisors reported to

Wagner. *Id.* The program was designed to remove a layer of supervision. *Id.* Plaintiff became the assistant chief in charge of biomedical engineering, projects and general maintenance. *Id.* His position was not impacted in terms of salary, grade level, seniority, pension or benefits. Peterson Deposition, at 134–35. Because he lost some of his supervisory responsibilities, Plaintiff felt he had been demoted and voiced his concerns to Wagner. *Id.* One manner in which Plaintiff felt his position was demoted involved his supervisory capacity over Scott Holley, who was the supervisor of the maintenance and operations department. *Id.*, at 146. In February 1995, when the reorganization was finally implemented, Holley was no longer under Plaintiff's supervision and became a peer. *Id.*

Meanwhile, in early 1995, Wagner created a position to supervise a major construction project at the facility. *Id.*, at 155–56. This position was offered to the Plaintiff who declined it due to its temporary nature. *Id.* However, Plaintiff recommended Jim Refenes for the position, a recommendation which Wagner accepted. *Id.* Despite the fact that Plaintiff had recommended Refenes for the job, he felt overworked after Refenes left because a replacement for him was not immediately hired. *Id.*, at 166–67. Prior to the reorganization, Plaintiff had performed as the acting chief to whom all departments reported. Nonetheless, he felt the reorganization, which placed him in a supervisory position over the biomedical engineering and general maintenance, drastically increased his workload and placed him in a supervisory position over areas for which he was unqualified. *Id.*, at 307–08.

Plaintiff's suspicions of Wagner and the "alliance" did not alleviate with time and in April 1995, he tape recorded "his side" of a telephone conversation with Wagner. Deposition Exhibit 7, *attached to* Plaintiff's Deposition Transcript, at ¶ 3. Moreover, Plaintiff used the recording to confront Wagner over the contents of that conver-

sation. *Id.* When summoned to Wagner's office to discuss the incident, Plaintiff refused to participate in the meeting unless he could tape record it. *Id.* This incident led to a charge of insubordination for which Plaintiff received a suspension. *Id.*

Moreover, copies of e-mail messages between Plaintiff and Wagner show a continuing struggle about management styles. On April 10, 1995, Plaintiff notified Wagner that an employee with a lower grade level should be preparing project reports. Deposition Exhibit 9, *attached to* Peterson Deposition. Wagner responded that such a procedure would result in too many errors. *Id.* Plaintiff responded that if he had to prepare the reports, he would need two hours per week of compensatory time. *Id.*

Plaintiff's first contact with an equal employment counselor was on April 13, 1995, at which time he complained that he was being discriminated against on the basis of age and reprisal. Exhibit K, EEO Counselor's Report, *attached to* Defendant's Motion. Plaintiff complained that he was retaliated against by Wagner due to his testimony in the investigation of the secretary's grievance. *Id.* Examples of such retaliation were Wagner's refusal to grant extensions on deadlines although Plaintiff was overworked after Refenes was transferred; Wagner told Plaintiff not to work overtime without prior permission; Plaintiff had been hired as a full assistant, but by virtue of the reorganization had been demoted; and Wagner refused to allow Plaintiff to tape record their meetings. *Id.* Plaintiff refused to meet with Wagner and the counselor. *Id.* As a resolution, Wagner agreed to hold Plaintiff's suspension in abeyance, review the situation in six months and repeal the action barring any further problems. *Id.* He also agreed to compensate Plaintiff for any overtime previously approved. *Id.*

> Mr. Peterson rejected the resolution. He expressed that if he accepted, there would be no acknowledgment of wrongdoing on Mr. Wagner's part and that too many things had happened to him in the past for which there would be no compensation. Mr. Peterson also expressed that he was concerned that an informal resolution would not provide a guarantee that the same situations would not recur. Even though I explained the benefits, Mr. Peterson indicated that he could not be satisfied with an informal resolution. I issued the "Notice of Right to File a Discrimination Complaint" on May 12, 1995.

*Id.*

In June 1995, Plaintiff received a satisfactory performance appraisal from Wagner. Deposition Exhibit 25, *attached to* Peterson Deposition. In August 1995, Plaintiff applied for his current position in Salisbury and was notified that he had been selected in February 1996. Peterson Deposition, at 232–34. However, in late 1995, Plaintiff filed a claim with the United States Department of Labor for uncompensated overtime work and a claim for benefits under the Federal Employees' Compensation Act for high blood pressure brought on by overwork and mistreatment by Wagner. Deposition Exhibit 19, *attached to* Peterson Deposition. In that claim, Plaintiff stated that his duties increased significantly in January 1995 when Refenes was reassigned without any prior notice. *Id.* This is in contrast to Plaintiff's deposition testimony in which he stated that he, in fact, recommended Refenes for the position. In the claim, Plaintiff also admitted that he worked on his grievances against Wagner while in his office after hours. *Id.* Despite his allegations of elevated blood pressure, Plaintiff noted that his physician had not prescribed any medication. *Id.*

Carl Wagner testified that when he was hired as the Chief of Engineering in 1993, Plaintiff was the full assistant chief engineer responsible for the operation of the entire engineering service. Exhibit F, Deposition of Carl Wagner, *attached to* Plaintiff's Memorandum, at 21. When the reorganization occurred, Plaintiff remained in charge of the biomedical engineering and

projects departments and took on responsibility for supervision of the carpentry and grounds departments. *Id.*, at 23. The number of employees which he supervised was reduced by 24. *Id.* The goal behind the reorganization was to reduce the numbers of supervisors through merger and attrition. *Id.*, at 26. Plaintiff complained after the reorganization that he had been assigned skills which he did not have, such as computer skills. *Id.*, at 33–34. However, he did not take advantage of training opportunities. *Id.* In Wagner's opinion, anytime that a deadline for a project was looming, Plaintiff would complain that he was overworked. *Id.*, at 53. Yet, Plaintiff was unable to properly delegate work to his employees. *Id.* Prior to the reorganization, Plaintiff did not complain about workload but blamed any delays on those directly underneath his supervision. *Id.*

Wagner testified that he formally reprimanded Plaintiff in March 1995 because the Plaintiff became upset during a meeting, told Wagner it was over and left. *Id.*, at 72. There were numerous occasions when Plaintiff was found doing personal work on government equipment. *Id.*, at 82–83. On another occasion, Plaintiff failed to disclose a personal relationship with the owner of a business which had submitted a bid for a job at the facility. *Id.*, at 94–96. Yet, Plaintiff served on a board to determine the bid award and recommended the bid be awarded to that business. *Id.* And, the bid was so awarded. *Id.*

Wagner also averred that he refused to approve overtime work for Plaintiff after Refenes' reassignment because "the work load was not there that he, as a GS–12, with the two (2) remaining Technicians in the Projects Section should have reasonably been able to complete in a timely manner." Exhibit D, Carl Wagner Deposition Exhibits, *attached to* Defendant's Motion, at Deposition Exhibit 9. Wagner also noted that he had been "a full Assistant Chief twice at two (2) other stations.

I know what duties are there. I know what duties I assigned him here. The work load was just never that great." *Id.*, at 6. Plaintiff requested overtime more than twice each week. *Id.* The reorganization of the engineering department initiated with President Clinton's recommendation that federal facilities reduce the layers of supervision. *Id.*, at 7–8. There were five layers of supervision at the Asheville facility before the person who actually performed the work received an assignment. *Id.* This meant that once the assignment was completed, it was reviewed five times before reaching the chief of engineering. *Id.* "I was Assistant Chief twice, [but] never did understand why they had an Assistant Chief. So it's always, I guess, been my belief even though I was in the position twice myself, why there was a need. If you had a Chief Engineer that was active all you're doing is telling somebody and their turning around and telling someone else." *Id.* The Associate Director asked Wagner to begin this process as early as 1994. *Id.* Plaintiff, in fact, was involved in implementing the reorganization. *Id.*

Although Plaintiff complained that he did not have the computer skills necessary to perform his duties after the reorganization, he refused to schedule training for himself and his employees. *Id.*, at 11. Basically, the Plaintiff ignored Wagner and operated in his own manner. *Id.*, at 18. In fact, after being suspended for tape recording his conversation with Wagner, Plaintiff continued to insist on his right to do so and when reprimanded by Wagner for working overtime, insinuated that he had been tape recording conversations with Wagner for use at a later date. *Id.*, 19–21. And, despite Plaintiff's allegations of reprisal stemming from the grievance filed by Wagner's secretary, Wagner has never read the testimony or investigatory documents. *Id.*, at 22. "I ... did not want to know what people testified on because I never wanted the question of reprisal to ever come up. I have absolute-

ly no idea what Randy testified to. I haven't requested a copy, haven't seen a copy and no one has told me what his testimony was." *Id.*

[Before the reorganization] Randy always had a supervisory cushion under him. He could always assign it to another supervisor who he could hold accountable, he never had the direct interaction with the actual work being done.... When those cushions were gone Randy found himself with, I don't know, he probably got close to twenty (20) years of government service, he's lost touch with what is actually happening. Because his management style is I don't need to know what's going on, I just need to tell somebody and they'll do it. I disagree with that.... Randy is certainly capable of learning computer and yet he's got a 486/66 with a 19 inch color monitor, fully CAD capable on his desk, in excess of one (1) year and to my knowledge has not turned it on. He doesn't know file manager, which is an integral part of all of Engineering's work order system, space management systems, project information, equipment information, all that is in the decentralized hospital computer system, but file manager is how we access that data. He has a very limited knowledge of it and has not attempted to learn.

*Id.,* at 23–24.

Plaintiff continues to be employed by the Defendant at the Salisbury facility. He has not suffered any reduction in grade level or pay as a result of the incidents which occurred in the Asheville facility.

## V. DISCUSSION

Title VII makes it an unlawful employment practice for an employer to discriminate against an employee because he has "made a charge, testified, assisted or participated in any manner in an inves-

tigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). In order to establish a *prima facie* case of retaliation, a plaintiff must show: (1) he engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between the two. *Karpel v. Inova Health Sys. Servs.,* 134 F.3d 1222, 1228 (4th Cir.1998). Here, Plaintiff engaged in protected activity by assisting the investigation of the grievance filed by Wagner's secretary. However, it does not appear that an adverse employment action was taken against the Plaintiff. It is true that the position of full assistant chief engineer was abolished; but, Plaintiff continued to function as a supervisor at the same salary, grade level, benefits, pension, and other employment conditions. This change does not constitute an adverse employment decision. *Williams v. County of Fairfax,* 164 F.3d 628 (table), 1998 WL 708694, *2 (4th Cir.1998) (Removal of supervisory duties did not constitute an adverse employment decision because it was not "hiring, granting leave, discharging, promoting [or] compensating."); *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 248 n. 11 (4th Cir.2000) ("The circuits are split as to whether an act of retaliation must be an 'ultimate employment decision' to qualify as an adverse employment action....) The Fourth Circuit has not resolved this issue; however, we noted in a case under 42 U.S.C. § 2000e–16(a), that Title VII 'has consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensating.' " (quoting *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981)).

Nonetheless, for purposes of finality, the undersigned will assume *arguendo* that Plaintiff has stated a *prima facie* case.[2] Thus, "the burden of production shifts to

---

**2.** Plaintiff claims the reorganization of the engineering department, the reassignment of Refenes, the refusal to grant overtime, his suspension, the filing of grievances and for-

mal EEOC charges, and being forced to take medical leave are all examples of adverse employment actions.

the employer to articulate some legitimate, nondiscriminatory reason for the employee's [treatment]. Once [Defendant] meets its burden of production, [Plaintiff] must bear the burden of proving that he was the victim of intentional discrimination. He can do this by demonstrating that [Defendant's] proffered reason was a mere pretext and that, as between his [allegations of retaliation] and [Defendant's] explanation, [retaliation] was the more likely reason for the [treatment]." *Vaughan v. The MetraHealth Companies, Inc.,* 145 F.3d 197, 199 (4th Cir.1998) (citations omitted).

■ The Defendant has given numerous legitimate, nondiscriminatory reasons for its actions. For example, Plaintiff attempted to surreptitiously tape record a meeting with his direct superior; and, once told that was not possible, continued to insist on his right to do so. The Fourth Circuit addressed this same factual scenario in a recent case.

> Brooks surreptitiously tape-recorded a meeting with his supervisor during which the latter displayed racial animosity toward Brooks' coworker. Brooks delivered the recording to the Authority officials, who terminated the supervisor.... On October 20, 1993, Brooks met with ... two of his superiors at the Authority, to discuss his claims of harassment. At the beginning of the meeting, Gentry inquired whether Brooks possessed a recording device and stated that he did not wish to be recorded. In response, Brooks produced a tape recorder and allowed Saunders to remove it from the room. Subsequently, however, Brooks implied to Saunders that he had recorded the meeting with a second recording device; he also told fellow employees that he had recorded the meeting.... Brooks was terminated for insubordination on the basis that he had defied a superior's order not to record the meeting.

*Brooks v. Southeastern Public Serv. Auth.,* 105 F.3d 646 (table), 1996 WL 751744, *1 (4th Cir.1996). The Fourth Circuit affirmed the district court's finding that dismissal for insubordination was a legitimate, nondiscriminatory reason which the plaintiff had failed to show was pretextual.

Likewise, the fact that the Plaintiff participated in investigations of grievances filed against Wagoner by other employees is insufficient to show that the employment actions taken were not legitimate. "[M]ere knowledge on the part of the employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee.'" *Burns v. Uninet, Inc.,* 211 F.3d 1264 (table), 2000 WL 349763, *4 (4th Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 188, 148 L.Ed.2d 130 (2000) (quoting *Williams v. Cerberonics,* 871 F.2d 452, 457 (4th Cir.1989)). Plaintiff made no allegations of being overworked, exposed to an unfair work environment or suffering retaliation during the time he was the acting chief of engineering. Indeed, all of his claims stem from the period of time after Wagner received the job. Early in their relationship, Plaintiff accused Wagoner, his superior, of "dumping on [him]" a certain task with no direction or training. If not insubordinate, such a comment was clearly less than tactful. He admitted to having reached the conclusion that Wagner and two other superiors had "an alliance," a conclusion which led him to tape record his interview with a resource officer investigating a claim against Wagner. During that meeting, he had no qualms about accusing Wagner of possible retaliation against him even though he knew nothing which would bode well for the complaining party. And, Plaintiff felt the need to record this session even though he knew nothing which would assist that party. In addition, the Plaintiff flaunted in Wagner's face the fact that he had tape recorded a prior telephone conversation with him, using this to corroborate Plaintiff's version of the conversation. After having been suspended, Plaintiff continued to insinuate to Wagner that he had

tape recorded other conversations with Wagner. Plaintiff, who did not dispute that Wagner had ordered him not to perform personal work at the office, admitted that he continued to do so, claiming that because it was after hours it was appropriate. He acted independently of Wagner's management style in most matters. Two particular incidents are telling; indeed, one of them clearly warranted dismissal. After filing a charge with the EEO counselor about Wagner, Plaintiff refused to meet with the counselor and Wagner. After learning of a resolution which would in no manner impact his personnel record, Plaintiff steadfastly refused to accept it because "there would be no acknowledgment of wrongdoing on Mr. Wagner's part." And, he participated in a decision to award a bid to a personal friend without disclosing that relationship.

Contrary to Plaintiff's contention, it is not always a jury question whether the Defendant's explanations are pretextual.

[In order] to survive a motion for summary judgment ... the plaintiff must do more than merely raise a jury question about the veracity of the employer's proffered justification. The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action. [A]n employer is entitled to summary judgment unless the [ ] plaintiff has adduced sufficient evidence "*both* that the reason was false, *and* that [retaliatory] discrimination was the real reason." This approach, dubbed "pretext-plus," is a better approach than "pretext only." Pretext-plus best preserves the character of statutes like [Title VII] as antidiscrimination statutes. [Title VII] "does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of [retaliation]." Of course, the simple fact "[t]hat the

employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of [retaliation] is correct...." "[N]othing in law would permit [a court] to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable."

*Vaughan,* 145 F.3d at 202 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 514–15, 523–24, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Here, the employer's explanations for its actions are entirely believable. Reorganizations, like reductions in force, target positions, not individuals. *Id.; Elliott v. Group Med. & Surgical Serv.,* 714 F.2d 556, 566 (5th Cir.1983) (There is little that management can do to correct inefficient job performance which does not implicate allegations of discrimination; thus, legitimate decisions must be unreachable.). The implementation of reorganizations, like reductions in force, are not pretextual. *Vaughan, supra; Coupe v. Mobil Oil Corp.,* 187 F.3d 629 (table), 1999 WL 511055, *2 (4th Cir.1999). Employees who disobey direct orders from their superiors are routinely terminated, an action which, although warranted, was not taken here. *Holmes v. West,* 210 F.3d 361 (table), 2000 WL 365400, *4 (4th Cir.2000) (Where an employee disobeyed a superior's order, that was not a pretextual reason for discharge.); *Chaney v. New Orleans Public Facility Management, Inc.,* 179 F.3d 164, 167 (5th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1439, 146 L.Ed.2d 327 (2000); *Sotolongo v. New York City Transit Authority,* 216 F.3d 1073 (table), 2000 WL 777958 (2d Cir. 2000); *Baker v. American Air Lines, Inc.,* 229 F.3d 1156, 2000 WL 772562 (9th Cir. 2000); *Barrera v. Preferred Technical Group,* 191 F.3d 455 (table), 1999 WL 569032 (7th Cir.1999). The surreptitious tape recording of conversations with superiors is a clear example of insubordination

warranting employee admonishment. *Brooks, supra; Perkovich v. Roadway Express, Inc.,* 106 F.3d 401 (table), 1997 WL 26457 (6th Cir.1997). And, the refusal to approve overtime compensation is insufficient to show pretext. *Aviles v. Cornell Forge Co.,* 183 F.3d 598, 604 (7th Cir.1999). Plaintiff has failed to show either that the Defendant's explanations are false or that retaliation is the real reason for the employment actions taken.[3]

## VI. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion for summary judgment is hereby **GRANTED.** A Judgment dismissing this action is filed herewith.

### *JUDGMENT*

For the reasons stated in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** that the Defendant's motion for summary judgment is **ALLOWED,** and this matter is hereby **DISMISSED WITH PREJUDICE** in its entirety.

---

**3.** The undersigned is compelled to note that the plethora of unreported decisions in this area is not an indication of a lack of precedent; indeed, it is instead a clear statement by all of the circuits of the volume of unwarranted, often frivolous, actions filed.